# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| IN RE: PRADAXA® (DABIGATRANETEXILATE) PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | 3:12-MD-02385-DRH-SCW<br><br>MDL No. 2385 |

This Document Relates to:
All Cases

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SANCTIONSAND OTHER RELIEF

The Plaintiffs' Steering Committee ("PSC") hereby moves, pursuant to Federal Rule of Civil Procedure 37 and the inherent power of the Court, for an Order imposing sanctions against Defendants Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") and Boehringer Ingelheim International GmbH ("BII") (collectively "Defendants")[1] as a result of a pattern of obstruction to the discovery process employed by Defendants and repeated violations of the Court's discovery orders by Defendants.

The PSC respectfully submits this memorandum in accordance with the Court's directive in its Minute Entry order dated September 6, 2013.[2] The PSC also respectfully requests that the Court shorten Defendants' time to respond to this motion consistent with the Court's September 6th Minute Order such that: (a) Defendants' response to the motion be due no later than September 16, 2013; and (b) the motion be heard at the September 18, 2013 conference.

---

[1] As the Court knows, both BIPI and BII have separately designated Lead Counsel in this MDL and those attorneys have only entered appearances for the specific defendant they want the Court to believe they represent. However, the PSC respectfully submits that what defendants have set up is deceptive to the Court because, *inter alia*, Lead Counsel for BII is overseeing the production of certain documents and databases by BIPI and Lead Counsel for BIPI is taking the lead scheduling depositions for BII witnesses. Because of this charade of representation there are times in this memorandum that the PSC refers to Defendants collectively and other times when a specific defendant is reference.

[2] As the Court is aware, virtually every status conference has had at least one Agenda item related to deficient, delinquent and/or non-compliant discovery practices from these defendants and/or their counsel. The most recent status conference was no different; as it included two such items — one of which included the PSC seeking leave to file a briefing or compendium summarizing these abuses.

## Preliminary Statement

As the Court is acutely aware, an undeniable pattern of discovery abuses and violations of the Court's orders by Defendants has developed in this litigation. These violations include repeated failures to provide discoverable materials (both voluntarily and in response to Court Orders), and the systemic "discovery" of documents and evidence after-the-fact, usually only after being caught by the PSC.

These abuses have caused and continue to cause severe prejudice to plaintiffs — significantly inhibiting plaintiffs' ability to develop their case in accordance with the deadlines set for expert disclosures and trials — due to significant disruptions in the discovery schedule; which include the following examples: adjournment of numerous defense depositions, repeated production of relevant documents on the eve of or just days before depositions, adjournment of certain bellwether depositions, amendments to pre-trial schedules, and the constant burden on the PSC to act as watchdog, unable to trust Defendants, and evaluating and second-guessing each production.

## I. THE COURT HAS EMPHASIZED THE IMPORTANCE OF MOVING THESE CASES EXPEDITIOUSLY TOWARDS TRIAL SINCE BEFORE THE MDL WAS CREATED

By way of brief background, since day one of this MDL (and even before the creation of the MDL) the Court made it clear to all parties that it intended to move this matter expeditiously. *See* Exhibit 1 at ¶ 10(e) [Doc. 4 in MDL]. Neither party could misapprehend the Court's position regarding the speed at which this MDL would move.

While movement towards trials is always an underlying goal of plaintiffs prosecuting cases in most litigations, in these cases an efficient and rapid docket is of critical importance because the plaintiff population in these cases is aged. In this regard the average age of plaintiffs in this litigation is greater than 75 years old. As such, delay, even a modest delay has far-reaching ramifications that prejudice the plaintiffs and cannot be countenanced.

It was made clear from the start that "an aggressive trial schedule" would benefit both parties — the defendants because it would give them the opportunity to quickly defend these claims and "clear their good name"; and the plaintiffs because it would give them their day in court before they passed away — the same way it would place certain obligations and requirements on both parties. Either way, the parties knew at the outset the pace this litigation would follow.

## A.      Pre-MDL movement

The first Pradaxa case was filed on May 11, 2012 in the United States District Court for the Southern District of Illinois. *Boston v. Boehringer Ingelheim Pharmaceuticals, Inc., et al.* Case No. 3:12-cv-00610-DRH-SCW. Thereafter, approximately seven other cases were filed at or about the same time. The Court consolidated the cases and set an initial status for June 28, 2012. *See* Exhibit 2  [Doc. 13 in Boston]. At Defendants' request, the Court conducted a telephone conference on June 13, 2012, wherein the defense suggested to the Court that all pending cases should be stayed pending consolidation and transfer by the Judicial Panel on Multidistrict Litigation (hereinafter "JPML"). Plaintiffs opposed this request. Thereafter, defendants filed a motion to stay, which the Court denied on June 20, 2012. *See* Exhibit 3 [Doc. 22 in Boston].

In denying the stay, the Court reasoned that staying the actions would delay discovery's commencement and that Defendants would still have to turn over the same documents and make the same witnesses available for deposition regardless of which Court was designated by the JPML to handle the Pradaxa MDL. *See* Exhibit 3 at 5. In its order, the Court also granted Defendants' request to move the status conference to July 13, 2012**.**

In keeping with the Court's directive, on June 28, 2012, plaintiffs served an initial set of discovery on defendants. *See* Exhibit 4.

The initial status conference of the consolidated actions was held on July 13, 2012. *See* Exhibit 5 [Doc. 26 in Boston]. At that conference plaintiffs informed the Court that initial discovery had been served, and Eric Hudson counsel for Defendants proposed producing the regulatory file by the "end of August, first of September… to have a meaningful production." *See* Exhibit 6 at 29**.** Mr. Hudson also advised the Court that the materials had been collected, and the Court directed defendants to get the review process started and to talk to plaintiffs about a reasonable production deadline. *See* Exhibit 6 at 30-31.

The Court made clear that it would have an aggressive discovery schedule and that it expected both parties to start gathering responsive documents promptly. *See* Exhibit 6 at 29. On July 24, 2012 the Court enter an order governing the format of document production *See* Exhibit 7 [Doc 30 in Boston]. Certainly, by this time there was no doubt that the Court expected efficient and prompt discovery compliance from all parties.

On July 31, 2012, Defendants responded to the request for production in the *Boston* action, which included many objections but no documents were produced. *See* Exhibit 8. In its responses, Defendants indicated that they would produce documents on a "rolling basis". On the same day, counsel for plaintiffs sent an email requesting a meet-and-confer on the objections and

production deadlines.  *See* Exhibit 9.  Priorities of production were discussed and on August 10, 2012, Mr. Hudson represented that the regulatory materials would be produced by September 1, 2012 and the other requested materials by October 1, 2012. *Id*.

In order to facilitate the expeditious production of documents, on July 20, 2012, the Court entered a Confidentiality Order (*See* Exhibit 10 [Doc. 28 in Boston]) and on July 24, 2012, an order related to the format in which the Defendants would produce Electronically Stored Information (*See* Exhibit 7) in the *Boston* case.  All of these events took place prior to the creation of the MDL.  All of these events made it clear to all parties that the Court intended to move these cases expeditiously and made it clear to the parties what would be expected of them in discovery.

**B.      Creation of the MDL**

On August 8, 2012, the JPML centralized all of the Pradaxa Products Liability cases and transferred them to the United States District Court for the Southern District of Illinois, before the Honorable Chief Judge David Herndon.  *See* Exhibit 11 [Doc. 1 in MDL].

On August 17, 2012, this Court entered Case Management Order No. 1 (hereinafter referred to as "CMO").  *See* Exhibit 1. In CMO 1, this Court clearly expressed its expectations that the litigation would move quickly for the benefit of all parties and the medical community. *See* Exhibit 1 ¶ 10(e).  Further, the Court made clear that it expected the parties to meet and discuss discovery time tables and a pre-trial schedule that would allow for a trial within 18- 24 months, and to do so before the initial status conference.

In order to comply with the mandates of CMO 1, plaintiffs' counsel set up a meeting with defense counsel to occur on September 8, 2012, in Memphis, Tennessee at the offices of Butler Snow.  This meeting occurred and the parties discussed the need for discovery to proceed quickly, proposed deadlines on the timing of discovery and pre-trial trial deadlines as well as an overall architecture of proposed CMO 6.

Plaintiffs also specially informed BIPI, that plaintiffs expected the discovery served in the *Boston* case to be responded to promptly, including a discussion of AER source file information and the NDA/IND productions.  Plaintiffs were assured that production was underway and would be provided "soon".

The Court subsequently appointed both plaintiff and defense leadership counsel in CMO 4 (entered on September 27, 2012) and CMO 5, respectively.  At this time, the PSC served a

master set of discovery on BIPI on September 28, 2012.[3] *See* Exhibit 12. As the Court can see, the PSC took the Court's directive to move the case expeditiously and began the discovery process even before their formal appointment and then formally served discovery immediately following their appointment.

## II.   THE HISTORY OF THE DISCOVERY ABUSES

As the Court is well aware, the discovery abuses in this case have been rampant. Sadly, those abuses that have formed the pattern of discovery violations of which the Court is aware is only the proverbial "tip of the iceberg" compared to the problems that have been encountered to date in this MDL.[4]

As set forth below, and largely in chronological order, the PSC has attempted to detail these problems for the Court as these discovery abuses both individually and collectively form the basis for the instant motion for sanctions. Indeed, the scope, volume, and recurrence of seemingly never-ending problems with producing both agreed upon and Court-ordered discovery as well as failing to voluntarily identify and produce discovery materials — things that were in the possession/knowledge of the defendants — until after the PSC has uncovered their existence and demanded their production despite falling squarely within the bounds of discovery and the PSC's discovery demands, has become the pattern and practice of the defense in this case.[5]

### A.   Discovery Failures From the Initial MDL Case Management Conference

On October 3, 2012, the Initial Status Conference[6] for the MDL took place in the Southern District of Illinois. At the hearing, the PSC informed the Court of the outstanding discovery from the *Boston* action, and the Defendants' failure to respond, as well as the fact that the PSC had served an additional set of discovery. *See* Exhibit 13 and Exhibit 14 [Doc 45 in MDL].

---

[3] Plaintiffs' counsel had informed defendants that we intended to serve this discovery as soon as the Court appointed leadership counsel with authority to serve discovery in the MDL.

[4] While the Court has been apprised of many of the above matters, there are also many that the Court has not been apprised of. Despite defense counsels' occasional characterizations that the PSC has sought to complain about every little matter, this is absolutely inaccurate. Indeed, as set forth herein, the Court will see that many of the discovery abuses, violations and failures to timely produce have been addressed by the PSC and defense counsel privately.

[5] While the PSC does not ascribe fault or motive to the discovery disasters that have become this litigation — it is undeniable that this discovery disaster is either the grossest of negligence on a systemic basis or designed as an intentional plan to thwart and delay the discovery and prosecution of this case. Under either scenario it is beyond compare to any litigation of recent memory and prejudices plaintiffs regardless of intent.

[6] It is important to point out that all of the status conferences included informal meetings by and between counsel and the Court in chambers in advance of the formal proceedings and hearings in open Court. This practice and procedure has been consented to by all parties.

At the in-chambers meeting that preceded the October 3, 2012 conference, the Court directed defendants to get documents produced, and the Court and the PSC were promised by BIPI that discovery was moving forward and they would meet the timelines they proposed to the PSC. However, right from the start of the litigation, Defendants failed to provide the production as promised and those productions that were made were wrought with problems and did not comply with the CMO governing the format for producing electronic information. Therefore, the PSC sent multiple letters to Defendants trying to resolve these discovery issues and to set deadlines. *See* Exhibit 15 (October 4, 2012 Letter from S. Katz relating to problems with production of the IND/NDA and failure to comply with the CMO governing electronic productions); Exhibit 16 (October 19, 2012 Letter from S. Katz relating to failure to respond to discovery); Exhibit 17 (October 23, 2012 Email from E. Hudson letter stating that production will be complete by January 31, 2013).

As the Court can see from these letters and this history, Defendants' pattern of failing to comply with discovery demands and discovery promises by the Defendants themselves began from the very outset of the MDL. The same is true for failure to comply with the Court's orders in the form of failure to comply with CMO 3 related to the format for producing the IND/NDA.

**B.      The November 5, 2012 Status Conference**

At the Status Conference held on November 5, 2012, Mikal Watts, one of the court-appointed Co-Lead Counsel for the PSC, made clear that notwithstanding the multiple promises from Defendants' counsel, that the PSC had not received any significant documents to review, either from the *Boston* set of discovery or the PSC's discovery requests, and that document review training sessions for PSC and other plaintiff lawyers had to be cancelled.

In response, Dan Ball, Liaison Counsel for Defendants, represented that Defendants were having and/or had "vendor issues" and would get a firm deadline on when documents responsive to the outstanding discovery would be produced to the PSC. Mr. Watts' informed the Court that the PSC would be addressing this with the Court promptly if BIPI did not come forth with a discovery schedule. *See* Exhibit 18 at 4-6.

**C.      No Discovery Responses Forthcoming, Despite Defendants Promises to Comply**

Notwithstanding Defendants multiple assurances, both to the PSC and the Court, a discovery schedule was not forthcoming. As a result, on November12, 2012, the PSC sent a

letter to the Court outlining the discovery problems and requesting that the Court enter an order establishing production deadlines.[7]  *See* Exhibit 19.

Thereafter, the PSC filed a Motion to Compel and for Discovery Deadlines consistent with its letter.  *See* Exhibit 20 [Doc 62 in MDL].   On November 16, 2012 defendants filed a response.  *See* Exhibit 21 [Doc 65 in MDL].  In its response, Defendants again blamed "vendor issues" as well as the size of the discovery requests as their excuse for not producing documents timely and as previously promised.  Curiously, Defendants also stated that "other issues" had been resolved and that they were in the process of accelerating the production of documents.  Finally, Defendants stated that they intended to have the document production substantially complete by January 31, 2013 and that depositions would be able to proceed as planned beginning in March 2013.  *See* Exhibit 21 at 2.

### D.      Failure to Provide Adequate Automatic Disclosures as Required by Rule 26

The Federal Rules of Civil Procedure require that any party to litigation in federal court make certain automatic disclosures, including but not limited to the identities of witnesses who are "likely to have discoverable information."  Fed. R. Civ. P. 26(a)(1)(A)(i).  To that end, BIPI's counsel, Eric Hudson, sent a letter to Plaintiffs' Co-Lead Counsel on October 12, 2012 identifying 28 BIPI employees with a general description of their employment title in order to give the PSC the ability to prioritize the production of custodial files.  *See* Exhibit 23. These witnesses were the individuals that BIPI believed to be the employees (or in some cases, former employees) who had knowledge and facts related to the claims and defenses in the case.  It turns out that this letter was woefully deficient in disclosing all relevant custodians to discuss.

Dr. Sonny Cornejo was not among these 28 witnesses.  Nor was Dr. Cornejo identified in BI's initial disclosures.  It was not until the Regulatory Rule 30(b)(6) deposition where Dr. Cornejo was identified as the sole Boehringer employee responsible for making a medical assessment of any Pradaxa-related post-market adverse event report to determine if the reported event was causally related to the drug.  A witness of this critical magnitude certainly should have been identified by Defendants as part of their obligation to identify witnesses with knowledge of the facts related to the issues in the litigation.  He is not a witness that the PSC should have been left to uncover through its own investigation.

In the same vein, BII identified its own list of witnesses who it assessed had knowledge about the claims and defense in this litigation.  The PSC had to identify more than 40 other

---

[7]  In fact, the Court will likely remember that Defendants complained about the process of the PSC writing to the Court instead of filing a formal motion.   In response, the Court explained in an e-mail to all counsel that the discovery dispute had been ongoing and Defendants' request for 14 days to file a response "only serves to waste time".  *See* Exhibit 22 (November 13, 2012 email from Court).  This e-mail communication from the Court further underscores the importance of moving the case forward and the commitment that the Court made to do just that.

witnesses to BIPI and/or BII failed to disclose (*e.g*., from BIPI: Dan DeLannoy, Jason Benater, Gabe Sung, Teri D'Alonzo, Eileen Grossman, Sabine Luik,  Armin Wiesler, Larry Brooks, Sierra Towers, Khurrum Ahmad, Frank Kornley, Max Mancini, Andrew Bardsley, Margaret-Sarah Alexander, Lauren Sullivan, David Pass, Bob Johnson, Tim Ryan, Tricia Keller, Peter Ziles, Anna Moses, Christopher Barrett, Kate O'Connor, Emily Baier, Suzanne Laussucq and from BII: Georg van Husen, Ulrich Roth, Jonathan Plumb, Dietmar Roeleke, Christian Schilling, Theo Nieuwenhuis, Paul Fonteyne, Mark Lewis, Judith von Gordon, Julia Meyer-Kleinmann , Andreas Clemens , Ulrich Drees, Peter Boehm , Ingrid Schulz, Judith von Gordon-Weichelt, Faith Busch, B.U. Monz, M. Korhonen, Herbert Noak, Ed Hollywood, David Prosia).  Finally, many of the witnesses that the PSC identified in their review of documents and initial depositions — those witnesses not identified by either BIPI or BII — are the witnesses who the PSC had decided to depose.  These are the witnesses who it appears have had the most involvement with and the greatest knowledge of Pradaxa.

### E.     Entry of CMOs 17 and 18

On November 20 and 29, 2012, respectively, the Court entered CMO 17 and 18 setting forth discovery deadlines for both Defendants to produce discovery.  *See* Exhibit 24 [Doc 68 in MDL] and Exhibit 25 [Doc. 71 in MDL].  These two CMOs set forth dates by which each defendant would produce the custodial files of various witnesses and dates by which each defendant would produce certain databases or document storage areas.

### F.     Defendants' Failures to Comply with CMO 17 and 18

By late December 2012, less than six weeks after the entry of CMO 17, BIPI was not able to meet all of the deadlines set forth therein and ultimately CMO 17 had to be amended.  On December 24, 2012 the PSC sent a detailed letter to defendants outlining many concerns that defendants were not complying with CMO 17.  *See* Exhibit 26 (December 24, 2012 Letter from S. Katz to E. Hudson).  Moreover, the PSC requested that defendants provide an affidavit that the missing portions of the numerous custodial files did not exist.  Defendants resisted providing any form of certification or affidavit but continued to assure the PSC that Defendants had met all of their obligations under CMO 17.

On January 2, 2013, the PSC wrote to the Court complaining that BIPI had missed production deadlines (*See* Exhibit 27).  Also on January 2, 2013, the Court entered Amended CMO 17 (*See* Exhibit 28 [Doc 78 in MDL]) extending certain of the dates in CMO 17 to give BIPI additional time to produce materials.  At the January 14, 2013 status conference, the Court was advised about the missed discovery deadlines by BIPI.  *See* Exhibit 29 [Doc 85 in MDL]. Additionally at this status conference, Defendants admitted to another database that was recently found and needed to be produced to plaintiffs.  The U.S. Defendants assured the Court and the

PSC that all that document productions would still be completed as directed in Amended CMO 17 and the foreign defendants assured the Court it would comply with the obligations in CMO 18.  *See* Exhibit 29.

It was also at the January 14, 2013 Status Conference that the PSC agreed that certain information in BRAIN and CERBERUS would be considered "Attorneys' Eyes Only" for 30 days for the parties to work out heightened confidentiality protection for these documents. Needless to say this time was extended because an agreement was not reached in 30 days. Ultimately, CMO 2, the order concerning the handling of confidential information was amended — after briefing and oral argument — to provide for a second tier of "highly confidential" status. Instead of producing documents as "attorneys' eyes only," Defendants waited until CMO 2 was modified (on June 10, 2013) to produce any documents they deemed to be "highly confidential."

However, at the February 7, 2013 status conference the PSC brought up concerns about BIPI not complying with Amended CMO 17 and not having provided a number of custodial files of individuals who had relevant Pradaxa information.  The Court directed BIPI to produce these files on March 1 and 15, 2013.  This additional time, in effect gave BIPI more time beyond what was ordered in Amended CMO 17.  *See* Exhibit 30.

Thereafter, at the March 14, 2013 Status Conference BIPI and BII both admitted to not timely providing certain databases to the PSC.  These databases included, IDEA for Sub and SAS from the Z Drive, in violation of CMOs 17 and 18.   The Court once again gave defendants more time to fix their non-compliance with the Court's prior Orders.  *See* Exhibit 31.

At the April 15, 2013 Status Conference the Court once again allowed more extensions of deadlines to produce databases and deadlines in CMO 28 were extended. *See* Exhibit 32 [Doc 169 in MDL].

### G.      The First BIPI Deponents - Defendants Failure to Comply with CMO 8

In early January 2013, the PSC requested the deposition of Paula Palmer.  By March 13, 2013, BIPI was informed of the intent of the PSC to take the depositions of Laszlo Sznaka, Timothy King and Robert Johnson. *See* Exhibit 33.

These depositions were schedule as follows: Palmer, February 28 and March 1; Szanka, April 29 and April 30; King, May 6 and May 7; and Johnson, May 20 and May 21. Pursuant to CMO 8 paragraph G, for depositions where BIPI was notified at least 60 days before the deposition date,  BIPI was required to provide updated and supplemental custodian files no less than 30 days prior to the deposition.  Unknown to the PSC at the time of these depositions, BIPI undertook no effort to provide supplemental documents from these witnesses custodial files.

Moreover, the defendants never informed the PSC of this fact and failure to supplement — all in violation of CMO 8. Indeed, The PSC did not learn of this failure to comply with CMO 8 until July 2013, when disclosed by Defendants' counsel, after many conversations.

Additionally, defendants withheld all "highly confidential" documents from these files; despite the PSC and the Court believing that such documents were being produced pursuant to the "attorneys' eyes only" request. *See* Exhibit 34 at 42-47. *See* Exhibit 35 at 5-7 [Doc. 230 in MDL].

## H. Failure to Timely Produce Relevant Document in Advance of Rule 30(b)(6) Deposition in Amsterdam[8]

While overseas in Amsterdam preparing to take a defense witness deposition related to BII's marketing of Pradaxa, the defense provided 4 pages of organizational charts to plaintiff's examining counsel, Mr. Katz. These documents were provided at approximately 2:40pm on the day before the BII Marketing Rule 30(b)(6) deposition.

BI's counsel sent an e-mail stating that during the preparation for the deposition the witness identified some additional documents that had not been produced. While the volume of documents was small (four additional pages of organization charts), these are clearly documents that should have been produced prior to the PSC's deposition team leaving the US and arriving in Amsterdam. By the time these documents were produced by e-mail, our team was in Amsterdam and did not have the resources of a full law office or a true US-style business center available to make color copies to be used to prepare for the deposition and make notes on for use at the deposition. And shockingly, copies were not provided by BI until the morning of the deposition when everyone arrived at the deposition. While the volume of documents was small, the point is that this is another example of BI not identifying and producing of all of the documents that they have an obligation to identify and produce until the 23rd hour during their preparation of the witness who is set to be deposed the following day. We now know that this would be the first of many instances of Defendants making "deposition eve" productions.

## I. Cancelation of all BIPI Depositions for a Period of 60 Days and Entry of CMO 37

As the Court is aware, during the status conference on June 10, 2013, the defense confessed to encountering document production "challenges," which led to them producing thousands of documents just days before four critical defense witness depositions:

- 5,589 documents 9 days before the Jeffrey Friedman deposition;

---

[8] This discovery violation has not been previously identified to the Court

- 28,000 documents 8 days before the Dan DeLannoy deposition;

- 6,592 documents 10 days before the Sonny Cornejo deposition; and

- 4,544 documents 11 days before the Tim Ryan deposition.

Indeed, these "challenges" led to the defense agreeing to take down nine depositions in total set for June and July.[9] The Defendants also agreed to work with the PSC on a proposed CMO 37 adjusting the deposition schedule, which necessarily pushed back all pre-trial deadlines. In that CMO, the PSC insisted on a means for a certification procedure to ensure productions are complete. Defendants originally agreed to work with the PSC on a certification process and to work with the PSC on rescheduling depositions at the time and in the sequence we desired.

What we learned from our meeting-and-conferring with Defendants for the two weeks following this was that *all* custodial files need supplementing both to get current to comply with CMO 17 and 21 because they are missing other documents that should have been produced in earlier productions. Hence, until we had a revised production schedule in place and an acknowledgment from the defense that a custodial file production was complete, we simply could not take depositions without being prejudiced.

As noted above, after this status conference, the PSC had numerous discussions with both BIPI and BII on their failures to provide timely documents, the failures to de-duplicate as required by CMO 3, and a number of discovery issues. BIPI and BII tried to explain the issues – from technical to vendor issues – assuring the PSC that everything was "fixed" and the document problems were solved. Not accepting the multiple explanations as satisfactory, the PSC insisted that BIPI and BII certify the production was complete when provided. Simply, put the PSC believed that a certificate from lead counsel would ensure problems were truly solved and timely productions in the future would be made.

---

[9] The defense claims the PSC pulled down the deposition of Dan DeLannoy, and technically the PSC examiner did ask it be adjourned before the document production "challenges" came to light. However, if we had known more than 60,000 pages of documents were not produced, surely this deposition would have been pulled by BIPI, as they did all of the other ones. Hence, it is simply disingenuous to submit, as they do, that this was a deposition that the PSC "pulled-down". In fact, the PSC received 13 supplements to this witnesses' custodial file production. Further, within twenty-two days of his originally scheduled deposition, BIPI dumped three (3) "supplemental" productions on the PSC. The first was May 15, 2013 in Production 48 and then again on May 28, 2013, fourteen (14) days before the deposition, in Production 50. Finally, four (4) days before the scheduled deposition, on June 7, 2013, BIPI produced 28,000 additional documents of the Dan DeLannoy custodian file. Moreover, and perhaps even more shocking and outrageous, just last week this witness had to have his rescheduled deposition pulled down at 12:30am on the day of the deposition due to yet another failure by these defendants to produce his relevant documents. *See* Section L below.

BIPI and BII ultimately refused to agree to a certification process and would not agree on the pre-trial deadlines that were disrupted due to their multiple discovery failures and violations of Court orders. In response, on June 28, 2013, the PSC wrote to the Court asking the Court to enter its version of CMO 37, which set a new schedule and required Defendants' Lead Counsel to provide an affidavit with each production certifying that the production was complete. *See* Exhibit 36. Prior to that time, Defendants' repeatedly failed to certify the productions in violation of Fed R. Civ. P. Rule 26(g). At the July 9, 2013 Status Conference, when asked why Defendants had not been complying with Rule 26(g), BII's counsel responded, "I don't have a good explanation for that." *See* Exhibit 34 at 57.

In its letter/brief and in oral argument, the PSC set forth the multiple violations of discovery orders by Defendants that had occurred to that date, as well as the fact that all depositions had to be cancelled, including Friedman, DeLannoy, Ryan and Cornejo because tens of thousands of pages of documents were dumped on the PSC within days and weeks of the scheduled depositions. The PSC's letter brief also pointed out the various court orders violated by the Defendants, including CMO 17, Amended CMO 17, CMO 18, CMO 22, and CMO 8. On July 9, 2013, at the monthly status conference the Court heard oral argument related to the PSC's motion for sanctions.

At oral argument on the PSC's motion, BIPI and BII offered various explanations for the discovery issues — including collecting the wrong "J Friedman file", technical and vendor issues and the overall volume of the production. However, BIPI's counsel told the Court that the issues were "resolved" or will be resolved "well in advance of the depositions of the witnesses" *See* Exhibit 34 at 29.

It was not until the July 9, 2013 status conference that the Court or the PSC learned that Defendants had not produced any "highly confidential documents" despite the agreement that they would be treated as "attorneys' eyes only." *See* Exhibit 34 at 41-42. This was a clear violation of the Court's prior order.

**J.    Entry of CMO 37 and 38**

On July 10, 2013, the Court entered CMO 38 to address the discovery deficiencies outlined in the PSC letter brief of June 28, 2013. After the Court reviewed the various factual submissions and entered oral argument, the Court found in favor of the PSC. *See* Exhibit 37 at 5 [Doc. 231]. The Court found that BIPI had not timely produced complete custodial files as required by Court orders, as outlined in the PSC's letter-brief. *See* Exhibit 36 at 5.

In addition, the Court found that BIPI unilaterally withheld "highly confidential" documents, and this violated the Court's orders. *See* CMO 34 at p. 7. Furthermore, because of the various discovery violations, the Court ordered that BIPI and BII attest to the completeness of productions. *Id* at 8. The required certification language was set forth in Exhibit A to CMO 37 in the form of an affidavit that had to be notarized and provided at the time of each production. Not willing to comply with the deadlines set forth in CMO 37 and the required certifications, on July 18, 2013, defendants sent a letter-brief to the Court asking for re-consideration. *See* Exhibit 38. On July 26, 2013, the Court entered an order denying the motion to reconsider CMO 37. *See* Exhibit 39 [Doc 240]. The Court went on to rule that it had made clear on July 24, 2012, when the first production order was entered and every monthly conference since then that his directions have been clear on discovery expectations.

**K.     Failure to Disclose Dr. Jeffrey Friedman's Retiring**[10]

As noted above, the parties had to reschedule the deposition of Dr. Jeffrey Friedman because Defendants produced 5,589 documents a mere 9 days before the deposition was set to take place on June 6-7, 2013.   As the parties were discussing rescheduling Friedman's deposition and a new production schedule, defense counsel subtly stated that Dr. Friedman was "retiring" from the company on July 31, 2013.

Again, still having a significant portion of his custodial file outstanding and document production problems still being faced, the defense begged that the PSC agree to take his deposition on a fast-track before the end of July 2013.   The fact that such a high-level witness' retirement was being conveyed with less than 45 days notice was both surprising and disturbing; particularly for lawyers who repeatedly stress their efforts at "transparency".  Thus, while this issue was never brought to the Court, the defense relented on their position that this deposition be taken before Dr. Friedman retired and ultimately agree to produce Dr. Friedman *after* his retirement.  Dr. Friedman's deposition is scheduled to take place on September 12 and 13, 2013.

In the continuation of the Defendants' pattern of repeatedly producing relevant documents after the deadline in the Court's orders, on September 9 and 10, 2013, BIPI produced additional documents related to Dr. Friedman's retirement.  Remarkably, it was not until the PSC realized that there were no documents relating to Dr. Friedman's retirement in BIPI's production and had to specifically request these documents — including Dr. Friedman's consulting agreement with BIPI.

Earlier today, the PSC wrote to the Court about the details surrounding yet another late production by Defendants.  *See* Exhibit 40.

---

[10]  This discovery-related issue was never raised with the Court

## L.    Non-Compliance With CMO 37 and Certification requirements[11]

The PSC knows of two separate instances when the defendants are indisputably in violation of the mandates of CMO 37.

First, there have been at least two separate instances where Defendants have certified that a production is complete, only to later produce additional documents that should have been previously produced. The certifications provided for the document productions concerning defense witnesses Dan DeLannoy and Jeffrey Friedman were, simply stated, false.[12]

On August 1 and August 23, 2013, Defendants certified that Mr. DeLannoy's productions were complete for all documents created on or before August 13, 2013. *See* Exhibits 41 and 42. However, as described in more detail below, on September 4, 2013 — within hours of the last status conference and less than 9 hours before Mr. DeLannoy's deposition was set to begin — BIPI produced over 5,000 pages of "newly discovered" day planners, which contained detailed information related to Pradaxa, that Mr. DeLannoy had kept dating back to 2007. As the Court is aware, Mr. DeLannoy's deposition was adjourned (at the defendants' offering) because of this untimely production and the relevance of these documents.[13]

Similarly, on August 23, 2013, Defendants certified that Dr. Friedman's production for all documents created on or before August 5, 2013. *See* Exhibit 43. As noted above, as late as yesterday (September 10, 2013), BIPI produced "newly discovered" documents relating to Dr. Friedman that are dated in July 2013.

Based on these facts, it is beyond dispute that: (a) the certifications that were provided by BIPI's Lead Counsel were demonstrably false despite the fact that they were made under oath; (b) Defendants have violated CMO 37 on multiple occasions; and (c) Defendants have not taken seriously the requirement to certify that the productions they are making are complete. Such conduct, warrants the imposition of significant sanctions.

---

[11]  Neither of these violations, have, to date, been brought to the Court's attention. However, they just underscore the recidivist nature of these defendants, and  the fact that the PSC is not, as these defendants at times contend, trying to always paint them in a bad light to the Court.

[12]The PSC is evaluating its options under Fed. R. Civ. P. Rule 11 to determine if there is a basis to seek separate sanctions against BIPI's Lead Counsel for signing false affidavits. Should the PSC make that determination, Rule 11 requires a separate motion and CMO 1 ¶ 11(c) in this MDL requires the PSC to seek leave of Court; unless the Court acts *sua sponte*.

[13]  What is even more troubling about this dump, is that this witness was previously tendered and slated for deposition. So arguably the defense must have engaged in detailed prepatory sessions with him. As we have learned the defense has prepared/met with witnesses for deposition preparation from 3 to 5 days to prepare their witnesses for depositions in this case. As such, we find it incredulous that the existence of these documents were not discovered the first time this witness was prepared for his deposition, but rather were only discovery at or about 12pm the very day before the witness's second scheduled deposition.

The second indisputable violation of CMO 37 relates directly to the form of the certification that the Court entered — an affidavit by Lead Counsel that is notarized. On at least three separate occasions, BIPI's Lead Counsel unilaterally modified the Court's Order by re-drafting the form Affidavit entered by the Court to: (a) make it a declaration instead of an affidavit, and (b) removing the notary block so that a notarized signature was no longer required. *See* Exhibits 44, Exhibit 45, Exhibit 46 and form affidavit entered by Court in CMO 37. Simply put, re-drafting the Court's Order to delete the Notary Public signature line (a) without leave of Court, (b) without the consent of the PSC, and (c) after having had their motion for reconsideration denied demonstrates nothing but the worst of intentions.

By way of brief background, when the Court entered CMO 37 — which was entered after hard-fought motion practice and argument by the parties — the Court required that BIPI's and BII's Lead Counsel provide a notarized affidavit with each production certifying that the production included all of the documents related to Pradaxa that were created on or before a certain date, and that date was to be no greater than 45 days before the production date. On August 15th and 16th, BIPI's Lead Counsel, Mr. Schmidt, took it upon himself to modify the Court's order. Instead of complying with the terms of CMO 37's affidavit requirement, BIPI's Lead Counsel provided to the PSC three different "declarations" with their production and surreptitiously removed the notary line from the declarations submitted. As noted above, BIPI's counsel did not seek leave of the Court to make this change to the Affidavit requirement of CMO 37, nor did he seek the PSC's consent to modify the requirement.

In fact, counsel did not even highlight the fact that — based on his excuse after-the-fact when the PSC caught the deception that he was not able to get the affidavit notarized due to his travel schedule — he was removing the notary lines, he just did so in the hope that no one would notice.[14] Had the PSC not caught BIPI's non-compliance with and unilateral, unauthorized change to CMO 37, the PSC believes that such behavior would have continued to this day. Upon being caught by the PSC for non-compliance with the terms of CMO 37 and altering the Court's order by removing the notary line in the hope of not getting caught, BIPI's counsel was not apologetic nor was he contrite. He simply blamed it on his travel schedule. *See* Exhibit 48. [15]

---

[14] Defendants repeatedly use the buzz-word "transparency" as they like to describe their conduct with regard to discovery and their production of documents. In fact, in Defendants' September 9th letter to the Court, Defendants write that the discovery gaps that the PSC has identified "have been limited, *have frequently been affirmatively uncovered and identified by Defendants*, have been remedied promptly by defendants, and *have not reflected active concealment or misconduct by Defendants*." *See* Exhibit 47 (Defendants' September 9, 2013 letter to Court) (emphasis added). Nothing could be farther from the truth when it comes to the modification of the affidavit to declarations by BIPI's Lead Counsel. Just the opposite is true, when counsel submitted these altered documents, he did so without identifying his alterations of the Court-ordered form and without any statement that he would comply with the terms of CMO 37 as it relates to these productions. This conduct can — and should — be characterized in many ways, however, transparent is not included in that list.

[15] While we have now agreed on a process to address counsel's travel schedule — (a) counsel will seek the PSC's permission in advance, (b) counsel will provide a not notarized version of the affidavit with the production that will have the notary line left blank, and (c) counsel will provide a notarized version of the same affidavit by an agreed

Accordingly, no matter how slight and trivial the defense may seek to portray this violation, it occurred repeatedly and is telling of the cavalier attitude Defendants hold towards discovery and Orders of this Court.

## M. "Jumbled" Production of AER Source files[16]

AER source files are the files that a drug company must keep regarding adverse events that get reported to the company. In its most simple form, these files often contain materials such as the original letter that a physician may write to the company to advise about an adverse event and the investigation that the company performs once they are advised about an adverse event. Needless to say, this information is very telling about the facts of the adverse event being reported and how the company characterizes the event. This information can be different from what the company enters into its adverse event database and even from what it reports to the FDA. Because of the import of this information, the PSC made the production of these files a priority from the very beginning of the Pradaxa litigation — it was prioritized in the *Boston* discovery and highlighted at the Memphis meeting on September 8, 2012.

After much negotiations relating to the types and volume of files to be produced, Defendants have produced the AER Source files in two major productions. The first production seemed not to have any problems. However, after getting the second production and beginning to conduct our review, the PSC discovered that the production had major problems. By way of example, in some instances medical records were not in the right folder and other folders were empty. The list of problems made the review impossible. In fact, the problems the PSC encountered were so severe that we hired an outside IT vendor because BIPI assured the PSC that there was nothing wrong with the production.

The problems encountered by the PSC resulted in multiple phone calls over several weeks with IT vendors on both sides. After the series of phone calls and many weeks of lost review time, BIPI finally confessed that it was a vendor issue on their part and described the problem as their vendor having "jumbled" the production and made the productions unusable until the IT folks made numerous "fixes." In August 2013, after more than a year of asking for the AER source files, BIPI has finally certified that the PSC now has a complete and usable set of the AER source files to review. The PSC is still reviewing the production to make sure that all of the problems have been cured. *See* Exhibit 49 (emails and letters setting forth the history).

---

upon date certain when counsel is back in the U.S. — these violations of CMO 37 cannot be overlooked or forgotten, nor can the fact that there was indisputably an attempt to deceive the PSC about the non-compliance with CMO 37's affidavit requirement.

[16] This discovery violation has not been previously identified to the Court.

The delay caused by (a) the "jumbled" production and (b) BIPI's repeated denial that there was a problem is significant. These are files that are stored separately, should be stored in an organized fashion so that they company can find them and refer to them or update them, and simply should have been copied and produced just as they are kept. To encounter a problem with this type of critical material begs the question about whether this was intentional on someone's part to frustrate the review.

Of relevance the PSC has not even been able to begin setting the depositions of defense witnesses responsible for AERs and more specifically Defendants' pharmacovigilence personnel — testimony that will be required to allow our experts to formulate their opinions on several topics.

**N.     Delays in Bellwether Discovery Materials[17]**

The discovery abuses by Defendants have not been limited to production of materials in the general liability case, the problems have been encountered in connection with case-specific discovery in the cases that are in the Bellwether pool. Examples of these problems include:

- The untimely production of the custodial files for some sales representatives, Certified Science Consultants and Medical Science Liaisons;

- A general unwillingness to confirm deposition dates for BIPI sales reps; and

- Newly discovered relevant evidence that the PSC is just discovering now that is impacting bellwether case discovery. See Section P, Q, R, S, T, and W, below.

BIPI failed to produce at least three sales rep files related to two (2) separate bellwether cases. The first of these files, sales representative David Spicehandler, was due to the PSC on June 30, 2013, as it relates to a bellwether case the defendants chose. The files of Mary Halpin and Darren Ott were due to the PSC on July 31, 2013. In an attempt to remedy this issue with the defendants, the PSC contacted Beth Rose, who responded in an email on July 24, 2013, that no documents existed for these representatives. She cited in this email that these representatives work for a third-party and they had contacted two (2) of the three (3) representatives and were advised that no files existed. Two weeks later, Beth Rose contacted the PSC and noted in an email regarding an unrelated production that BIPI located emails for these three (3) representatives on July 29, 2013. These files were eventually produced on August 26, 2013, nearly thirty (30) days after their original due date.

---

[17] This discovery violation has not been previously identified to the Court.

It is also important to point out that because of all of the other delays in the taking of substantive defense depositions of scientists and medical witnesses employed by the defendants, the PSC is now required to have "double-duty"; namely we are prejudiced insomuch as we have to try and prepare both the general liability and bellwether cases at the same time. This is a significant prejudice brought out solely by the defendants conduct in providing (or not) discovery. While the defense may claim that they are prejudiced as well, namely that they have to defend their witness depositions and they also have to prepare the bellwether cases, the only reason we are in this position is because of the defendants' never ending discovery disasters and violations outlined herein

Simply put, these problems have caused an unnecessary delay in the pretrial schedule that has been entered by the Court. As noted above, the plaintiff population is elderly and these kinds of delays have a much more serious impact on the plaintiffs than they do on the defendants — in fact these delays may benefit the defendants.

**O.  Failure to Produce Relevant Documents in Advance of Mary Sullivan Deposition[18]**

For defense witness, Mary Sullivan, just 10 days before her deposition on August 22 and 23, 2013, the defense advised that they had "found" some of her hand-written notes. Initially, Defendants described this as a "handful" of pages, perhaps under 20 pages. As it turned out, Ms. Sullivan's notes amounted to 800 pages — albeit some were blank — and over 500 pages with actual hand-written and hard to decipher notes dating back years.

The notes were extremely substantive. Over half of the deposition was spent on the notes, either understanding what was written or asking substantive question about the contents of the notes. Moreover, the disruptive effect of this late production on the PSC was significant as the lead examiner was forced to cease all other preparation for the deposition to read and try to decipher the notes. It took three full days reviewing only these notes to get through all 800 pages of this late production.

**P.  CSC - Certified Science Consultants[19]**

Plaintiffs through their own efforts discovered the existence of this very important separate sales force that Defendants never identified to the PSC. A Certified Science Consultant ("CSC") is a part of the promotional arm of BIPI and specifically Pradaxa. CSCs are individuals with some level of advanced education or certification such as PharmD. They serve a nuanced

---

[18] This discovery violation has not been previously identified to the Court.

[19] This issue has only just been raised with the Court, but to announce that it likely has been resolved, despite the non-disclosures previously by these Defendants.

purpose of delivering an "unbranded" message to physicians, allowing them to say things that a sales representative could not say, such as discussing a-fib rather than non-valvular a-fib, and discussing Warfarin in general terms and not just in relation to comparison studies. The documented purpose of the CSC was to "disrupt" physicians' confidence in Warfarin. The CSCs originally did not discuss a particular product to treat the disease, but in theory were trying to raise disease awareness — however they never raised awareness of a disease Defendants did not have a product to treat. In fact, originally BIPI had "guardrails" to prevent a doctor from being detailed about a product within 24 hours of a call by a CSC because they wanted to avoid the appearance of "off-label" promotion. In 2012, however, CSCs began to educate the doctors on the branded product — here Pradaxa — at the same visit they raised awareness to a disease.

Because the existence of this specialized sales force was not disclosed by the defendants, the PSC did not know they existed, until we uncovered the words CSC in other documents the defense had produced.

What is extremely troubling in this regard, is that this information was specifically requested by the PSC in prior discovery and in the Defendant Fact Sheet ("DFS"). Indeed, there are detailed sections of the DFS that call for the identification and production of this information. *See* Exhibit 50, DFS Section II.C. The DFS is meant to focus on information specific to the Defendants' interactions with specific healthcare providers, primarily prescribing physicians.

At no time during the 3 month negotiation process of the DFS or when producing responsive information to the DFS did the Defendants inform the PSC that there were CSCs, and that CSC information was responsive to the discovery requested by the DFS.

Like so many other pieces of discovery, only through plaintiffs' persistence (including seeing references to CSC's in other documents we received from the Defendants) has the PSC learned that several of the CSCs called on bellwether prescribing physicians.

Also quite telling, Defendants promised the PSC that CSCs only called on physicians who treated 3 bellwether plaintiffs. This turned out not to be true.

Plaintiffs began asking about the CSCs by title in July 2013. We were told repeatedly that all of the information on the CSC physician calls were contained in the VISTA database and had been disclosed. Through that, defendants disclosed the existence of three CSCs that called on bellwether physicians. Plaintiffs refused to accept this answer and repeatedly questioned whether all of the data on the CSCs may have been kept in a separate database or in a separate field within VISTA. After more than 5 separate conversations questioning the Defendants, asking them to go back and check, it was *finally* revealed by them that there was in fact a

separate field within VISTA that contained the CSC data and that this field had *not* been disclosed to the PSC and had not been produced.[20]

This field from the VISTA database was finally produced on September 10, 2013, just yesterday.

Additionally, less than five days ago (on September 7, 2013), Defendants disclosed four more CSCs that called on physicians who treated bellwether plaintiffs.

While the PSC can never be sure, the PSC cannot imagine that this lack of disclosure was intentional by the attorneys representing Defendants. But the Plaintiffs, arguably due to the risk of off-label promotion and potential violation of a Corporate Integrity agreement, do suspect that there may have been an intentional effort by BIPI to keep the existence of this CSC force from the plaintiffs.

## Q. Medical Science Liaisons and the Bold database[21]

Having only recently learned of their existence, Plaintiffs can only really assume what a Medical Science Liaison ("MSL") is and what their role is. It appears that the MSLs were another separate specialized group within BIPI that was responsible for making direct contact with a physician under the auspices of having a scientific conversation about a-fib, Warfarin and other subjects that could not be discussed as part of the direct promotion of Pradaxa. The information from those meetings were maintained in BOLD.

The BOLD database contains information about MSL visits with physicians. The database also contains very specific information about the physicians on which the MSLs make their in-person calls. It includes the following fields of information related to these physicians, which include narratives of what was discussed during these visits:

1. Personal information
2. Biography
3. Publications
4. Trials
5. Payments
6. Interactions

---

[20] Of importance, VISTA and its fields were also extensively discussed and negotiated during the DFS negotiations between November 2012 through January 2013. And once again, this "hidden field" about the CSC's never was disclosed by Defendants or their counsel.

[21] This issue was raised with the Court at the last status conference only to state that the defendants were now trying to comply and provide responsive documents.

7. Events
8. Objectives
9. Documents

The existence of BOLD was not disclosed to Plaintiffs in discovery or as part of the 30(b)(6) deposition process. The existence of MSLs and BOLD was disclosed only in relation to the PSC uncovering the CSC issue and only when the PSC asked Defendants if there were any other forces that called on physicians. The BOLD database was not produced until August 30, 2013. And of course, we just learned that there are at least three known MSLs that called on bellwether plaintiff prescribing physicians.

It is very important to note that BOLD contains a field entitled "payments", which the PSC believes was made to physicians on the BIPI speakers bureau. Very early on, the PSC inquired about payments made to physicians. This was memorialized in the DFS at Sections III.A and III.B. Surprisingly (both to the defense and plaintiffs' attorneys), the PSC was informed that this information was very difficult for BIPI and/or it lawyers to obtain and was actually stored and accessible in different locations, hence the reasons for the demarcation in the dates in the DFS for certain years.[22]

Moreover, BOLD was never disclosed to the PSC nor mentioned during the Rule 30(b)(6) deposition related to databases and storage locations for electronic information however, what is now known is that significant relevant and discoverable information is maintained in the BOLD database. Likewise, it was not even addressed in the pleading from defendants identifying the various databases (which defendants provided, in part, in an effort to obviate the need for such a 30(b)(6) deposition). *See* Exhibit 51.

Assuming (considering that we have obviously not done any further discovery relating to BOLD because it was not disclosed prior to or during the Rule 30(b)(6) deposition on databases and electronically stored information) that BOLD was in place throughout this litigation, the only conclusion that can be drawn is that BIPI intentionally withheld its existence.

Again, while the PSC can never be sure, the PSC cannot imagine that this lack of disclosure was intentional by the attorneys representing Defendants who were negotiating these very issues during the multi-month long DFS negotiation process or even the 30(b)(6) deposition. But Plaintiffs do suspect that there was an intentional effort by BIPI to keep the existence of this from the plaintiffs.

---

[22] Surely when discussing this information in connection with their obligations under the DFS Defendants had to have discussed with their lawyer(s) where it was maintained - namely within the BOLD database. However, as we unfortunately know now, the BOLD database was never disclosed to the PSC until uncovered in late August, 2013. *See* Section T, below.

**R.      WebBI[23]**

It was not until the deposition of Mary Sullivan on August 22 and 23, 2013, that Plaintiffs learned of the existence WebBI (pronounced "Webby").  WebBI was never disclosed to the PSC nor mentioned during the Rule 30(b)(6) deposition related to databases and storage locations for electronic information.  Plaintiffs have been working with the defense to get a better understanding of WebBI.  There have been descriptions of this made by the defense, but Plaintiffs now feel compelled to seek further discovery to understand what WebBI actually is and what it contains.

Through the conversation about WebBI, and the handwritten notes of Mary Sullivan, Plaintiffs learned of sales training presentations and other materials that were not produced because they were not "specifically" related to Pradaxa.  Obviously, this makes no sense to Plaintiffs as these general training materials were utilized with representatives promoting Pradaxa and are responsive to the discovery requests propounded by the PSC.

**S.      Defendants' Failure to Identify and Produce "Link"[24]**

"Link" is an internal communication system similar to instant messaging.  "Link" is yet another form of electronic information that was not disclosed to the PSC during initial disclosures or the Rule 30(b)(6) deposition process.   Once again, it was not until the deposition of Mary Sullivan in late August 2013, that Plaintiffs learned of the existence of "Link."

It is, however, clear that employees of Defendants utilized "Link" and likely discussed Pradaxa-related information via "Link."  If this is true, then Defendants have failed to produce relevant and discoverable information — perhaps sufficient enough make all CMO 37 certifications provided to date false and certainly sufficient enough to call into question all CMO 37 certifications that have been provided to date.

Conversely if only some subset of defense witnesses used "Link" that too must be known.  However, we have just discovered this omission from the overall discovery and in the face of all of the other discovery failures by Defendants, Plaintiffs have not yet had the time to discover further what the "Link" system entails and why it was not disclosed or produced or when it will be produced in full (and what impact it will have on the bellwether cases and/or prior, ongoing, and upcoming substantive defense witness depositions.

---

[23]   This issue has not been raised with the Court.

[24]  This issue has not been raised with the Court.

## T.     Untimely Disclosure of a New Database In August 2013[25]

As noted above, the PSC surprisingly was only informed about the existence of a highly relevant, yet never previously disclosed database, named BOLD.  BOLD appears to be a database where BIPI stores information about key opinion leaders, speakers bureau members and other medical professionals that have been in paid by or otherwise in direct contact with BIPI and BI.  However, further discovery is needed to fully understand and appreciate exactly what is contained in BOLD.

While this disclosure should have been made in the Rule 26 disclosures, during any number of the many meet-and-confers, it should have been codified in the document production CMOs, and most tellingly it surely should have been responded to in the 30(b)(6) deposition on this very topic or revealed during the DFS which specifically addresses this issue.  *See* Exhibit 50, DFS at Section III.A, III.B, and III.C.

## U.     Migrating from One Database to Another Without Notifying PSC[26]

In mid-2013, BIPI undertook to stop using two existing databases and start storing that information into a new database called VEEVA.  The first database that BIPI migrated into VEEVA was the BOLD database — the existence of which was not disclosed to the PSC, as noted above.  On May 3, 2013, BIPI stopped entering data into BOLD and began putting the data that was going into BOLD into one part of VEEVA.  The second database that BIPI stopped using and began putting the data into VEEVA is VISTA, which was BIPI's sales call notes database.  VISTA is one of the databases that is subject to the schedule set out in CMO 17 and requires BIPI to make quarterly updated productions as it is a database that continually receives new input when doctors are "detailed."

On July 1, 2013, BIPI stopped putting new data into VISTA and began to put it into VEEVA.  Of note, none of the old or "legacy" data from either VISTA or BOLD was imported into VEEVA.  It was not until the PSC began to inquire about the BOLD database that BIPI disclosed that VISTA was "off-line" as of July 1, 2013.  One can only wonder if or when that disclosure would have been made had the PSC not been pressing BIPI about BOLD.  The disclosure of this transition to VEEVA was not made until mid-August.[27]

---

[25]  This issue was raised with the Court at the last status conference only to state that the defendants were now trying to comply and provide responsive documents.

[26]  This issue has not been raised with the Court.

[27]  Obviously aware of their discovery obligations, these same defendants notified the PSC of receipt of a misprinted brochure that they intended to discard because it was never used and because it was misprinted, yet disclosure of documents and information of substance and highly relevant to the case, are repeatedly neglected.

Not telling the PSC about migrating from VISTA to VEEVA until significantly after the migration (moved BOLD side on May 3, 2013 and VISTA side on July 1, 2013) is shocking. While the next VISTA update is not due until October 1, 2013, modification of the production format to account for a new database with different fields and different field names is a time-consuming process that should have been addressed once BIPI knew it was going to make this transition. There have been several recent calls with Defendants' counsel about these issues and some of those calls have involved the PSC's IT vendor to make sure that the new deliverable will be useable. At the current time, there is certainly a feeling that there will be problems

### V.  Unwillingness to Produce Key Witness Wa'el Hashad's Custodial file

PSC has moved to compel the production of the custodial file of this key marketing witness. The PSC's motion was filed with the Court on September 4, 2013 prior to the last monthly status conference [Doc No. 256] and is incorporated herein by reference. In that motion, the PSC advises the Court about the custodial file of a key marketing witness and BIPI's failure to locate the existence of that custodial file. That motion details the PSC's concerns with the effectiveness and issuance of the litigation holds that Defendants have told the Court they put in place. The motion also details when the PSC submits that Defendants should have issued litigation holds as a result of expecting litigation.

Mr. Hashad is a key witness that the PSC identified early on as a witness they intend to depose. Taking his deposition without a custodial file puts the PSC at a significant disadvantage and imposes significant prejudice on the PSC.

At this same status conference, counsel for BII informed the Court that BII is aware of preservation obligations and notices went out before the MDL was formed. *See* Exhibit 18 at 11.

### W.  Failure to disclose and preserve Ask BI internal Blog[28]

BIPI maintained an internal blog called Ask BI, which was in use as late as May 2011. This internal blog was meant to be an "informal discussion" blog. One aspect of the blog is that the content did not have to go through MLR review. MLR stands for medical, legal, regulatory review, which all of BIPI's marketing and advertising information is supposed to go through. BIPI's employees were well aware that anything that was posted on the blog was "discoverable." *See* Exhibit 52. The employees were told the blog is monitored. BIPI's employees were encouraged to give their opinions on the blog because BIPI wanted "lots of different perspectives to be part of the discussion." The Ask BI blog was never identified to the PSC by BIPI. Like so

---

[28]  This issue is identified in footnote 8 to the PSC's Motion to Compel the custodial file of Wa'el Hashad filed on September 4, 2013 [Doc. 256].

many other pieces of significantly relevant discovery, the PSC had to uncover its existence through its own review of documents.

However, the request for this information was made to BIPI as part of the PSC's initial DFS. *See* Exhibit 53 Sections II.C.9-10.

The defendants never advised us that responsive information existed or that there was such a blog.

When the PSC learned of this Blog and asked for the production of the Ask BI blog, we were informed that it was not preserved thus could not be produced. However, the fact that the PSC has only now just uncovered its existence in late August 2013, and the fact that it has been destroyed, is warranting of a significant sanction, including but not limited a mandatory missing document charge.

### X. "Date-Created" Meta-Data Field Differs from the Date on the Face of the Document[29]

In some of the custodial files there are many e-mails that have a different "date created" in the meta-data than the date on the face of the e-mail. In getting ready for depositions of BII witnesses, the PSC discovered that there are many e-mails for which the meta-data provided by BII does not match the date on the face of the e-mail. *See* Exhibit 54. Examples of the problem are attached hereto. *See* Exhibit 55 (BIPI-PRA-0007612120 e-mail dated May 28, 2010) and Exhibit 56 (Screenshot of meta-data provided for that document showing "DateCreated" as June 28, 2010); *See* Exhibit 57 (BIPI-PRA-0007612004 e-mail dated April 28, 2010) and Exhibit 58 (Screenshot of meta-data provided for that document showing "DateCreated" as June 28, 2010).[30]

The failure to have the meta-data and the actual documents match puts a hurdle on the PSC's ability to prepare for these depositions by attempting to create an accurate timeline through the witness' e-mails by sorting the documents in our document review platform by the "date created" meta-data field. The PSC identified some examples to BI's counsel and BI had a response that it had to do with the way the custodian "managed and stores certain email" by moving the email into different folders or storage areas on their computer. *See* Exhibit 59. BII's explanation simply does not make sense to the PSC that saving an email in a certain way will modify the "date created" field instead of the "date last accessed" field.

---

[29]   This issue has not been raised with the Court.

[30]   These are but two examples out of dozens that the PSC noted in getting ready for a single deposition.

### Y. Failure to Timely Produce Relevant Documents in Advance of Dan DeLannoy Deposition

As the Court is aware from the PSC's September 5, 2013 letter, the deposition of Dan DeLannoy was canceled just hours before it was set to begin. *See* Exhibit 60. A few mere hours after leaving the September 4, 2013 status conference, BIPI's counsel contacted the PSC to advise that they had identified new documents for Mr. DeLannoy that they would produce soon and offering to cancel his deposition and reimburse the examiners their expenses for the travel to Connecticut. Approximately eleven (11) hours later at 11:30pm on September 4th, BIPI produced over 5,000 pages of substantive information contained in the day planners that Mr. DeLannoy kept dating back to 2007.

### Z. Failure to Timely Produce Relevant Documents in Advance of Dr. Jeffrey Friedman Deposition

As the Court is aware from the PSC's September 11, 2013 letter, there has been yet another late production of documents for a witness that is set to be deposed on September 12th and September 13th. *See* Exhibit 40 (September 11, 2013 Letter from S. Davis to Court). BIPI produced new documents for the deposition of Dr. Friedman on September 9, 2013 at 10:44am eastern and September 10, 2013 at 5:42 eastern. Dr. Friedman's deposition is being taken on September 12 and September 13, 2013. While the productions were 4 pages and 56 pages of documents, respectively, they all related to his retirement. BIPI knew that was an important topic and would be covered extensively at the deposition based on the conversations had when scheduling the deposition.

Most disturbing is that BIPI did not even look for these documents until ***after*** the PSC raised the issue that no documents relating to Dr. Friedman's retirement had been produced. This is simply another piece of the repeated pattern of Defendants lax attitude towards their discovery obligations and obligation to comply with Orders entered by this Court.

Moreover what is also telling is that these documents identify an ethics complaint from Mr. Friedman that was addressed with BIPI employee (and possible witness) Ms. Hawthorne. Obviously the PSC would have liked to have this information and this discovery *before* the deposition of Dr. Friedman about this highly relevant issue. However, with the deposition less than 12 hours away, and only just receiving this information now (because it was withheld by the defense), the PSC is once again prejudiced.

### AA. Other Difficult Matters

While not formal discovery abuses or non-compliance with Court Orders, the PSC submits the following examples of certain litigation matters that should not be adversarial or difficult. However, for each of the following, the defense has taken positions that have served —

or perhaps are designed — to frustrate Plaintiffs and place needless hurdles in front of the Plaintiffs in this litigation:

- **BIPI Depositions in Danbury, Connecticut**: BIPI has steadfastly insisted that all corporate witness depositions occur in Danbury, Connecticut and has repeatedly rejected the PSC's requests to move these depositions to a more convenient location or a location with better business services. The hotels where these depositions take place are not convenient to travel to — thereby adding unwarranted burdens of both time and money to the plaintiffs' prosecution of their case — and do not have adequate business amenities to make conducting these depositions an efficient process as evidenced by the fact that it took Defendants 11 hours to have copies of the DeLannoy day planners made in Stamford, Connecticut and delivered to Danbury, Connecticut. If Danbury were such a bustling hub of business Defendants certainly would have been able to have copies made in Danbury, which is presumptively where they were meeting with the witness or at least closer to where they were meeting with the witness than Stamford is.

- **BII Depositions overseas**: BII is also insisting that the PSC travel with an entire team — including lawyers, paralegals, court reporters, videographers, etc. — to Europe instead of flying one person - their witness — to the U.S. in order to take the depositions of the BII witnesses. The balancing of the cost of flying a witness to the U.S. vs. flying a team of people to Europe (which includes the defense attorneys) is demonstrably one-sided. These depositions could be in conducted in the U.S. as is being done in other mass tort pharmaceutical litigation that is currently underway in state court in Cook County, Illinois, where the parties ***agreed*** that the defendant would bring their witnesses from Japan to the U.S. for their deposition.

- **Defendants' refusal to schedule foreign depositions on weekends**: The PSC had requested that while travelling overseas in Europe for depositions that depositions be conducted on weekends in order to make the best use of the time our team was in Europe, reduce the amount of time the plaintiffs' deposition team would need to be away from their families, and

to reduce the cost by reducing the number of nights required to be in Europe. The defense simply refused this request.[31, 32]

- ▪ <u>Opposing Judge Stack as Deposition Special Master/mediator, but then requesting that Judge Stack serve as a Discovery Dispute Special Master/mediator</u>:  As the Court will recall, it was the PSC who sought the appointment of a third-party neutral to serve as a mediator during depositions and Defendants opposed that appointment.  This required the PSC to formally request that the Court appoint such a neutral and teh PSC requested Judge Stack via letter brief, which the Defendants formally opposed.  *See* Exhibit 61 (July 16, 2013 Letter from M. Niemeyer to Court) and Exhibit 62 (July 23, 2013 Letter from P. Schmidt to Court).  Once Defendants lost their opposition and Judge Stack was appointed, they then saw an opportunity to inject delay into the everyday discovery disputes they invent in this litigation by seeking to have Judge Stack appointed to mediate all discovery disputes so that the Defendants could add a layer of additional briefing and work to the process before a dispute could be brought to the Court.  While the PSC was reluctant to add delay into the process and stated that we believed that to be Defendants' intention, we readily agreed that if the process would not inject delay we would be happy to have Judge Stack appointed.  That resulted in the entry of CMO 43 on consent of the parties.  *See* Exhibit 63[Doc. 262 in MDL] (CMO 43).

- ▪ <u>Failure to Assist the PSC in Obtaining Documents from Third Party PHRI as requested by the Court at the July 9, 2013 Status Conference</u>.  As the Court will recall, in May 2013, the PSC sought the issuance of Letters Rogatory in order to obtain discovery from an entity in Canada that performed the RE-LY study for Defendants.  *See* Exhibit 64 [Doc. 173 in MDL.  The Court granted the PSC's motion on May 14, 2013.  At every status conference since the issue of obtaining these critical documents from PHRI— which we have now learned is really two separate legal

---

[31] Ironically, in the U.S. when a former BIPI employees — Anna Moses —requested a weekend deposition because she was finding a hard time finding two weekdays should could be away from her job duties in order to sit for her deposition, the PSC, of course, accommodated her without any hesitation.

[32] Of importance, the PSC agreed to re-arrange the sequencing of two of the four foreign witnesses at the request of the defense (after the depositions were already set) due to a personal commitment made by the defense.  In juxtaposition to this, by virtue of the defense's unwillingness to schedule depositions on weekends while in Europe and/or the fact that one of the German witnesses is "demanding" a translator when same is likely not needed (and which adds significant time to the deposition) such that one of the PSC's attorneys spearheading the preparation of this deposition is at present planning to miss her cousin's wedding.

entities, McMasters University and Hamilton Health Sciences Corporation — has been on the agenda and has been raised by the PSC because of the delay tactics that PHRI was employing in Canada. At the July 9, 2013 status conference, the Court specifically requested that Defendants' counsel attempt to assist the PSC in obtaining those documents and Defendants' counsel agreed to do so. *See* Exhibit 34 at 9-13. The PSC does not know if Defendants' counsel was simply being disingenuous with the Court or was intentionally lying to the Court in his response that he will "certainly look at that" when asked to assist the PSC, but needless to say the PSC is not aware of and has not seen any evidence that Defendants have taken any steps to assist the PSC in obtaining documents from PHRI.

## III. THE RESULTING PREJUDICE

As noted above, the result of Defendants' refusal to fully participate in discovery, repeated violations of the Court's orders, and misplaced and inaccurate document production certifications, the plaintiffs have been prejudiced.

To date the resulting prejudice suffered by Plaintiffs as a result of Defendants' repeated and systemic discovery violations is tremendous. Indeed, because of these significant delays and the obstruction of the discovery process, the PSC has been hindered in their ability to put together and in the prosecution of their case.

Some of the specific examples of prejudice include:

- The PSC has taken a total of 14 depositions to date (nine 30(b)(6) depositions and five defense fact/corporate witnesses and at least 15-16 depositions will be taken in the next 2 months; those depositions have been taken and will be taken without the benefit of the thorough review of the information that should have been timely disclosed as detailed herein. The PSC has lost their ability to fully and completely examine defense witnesses because the defense has withheld highly relevant information.[33]

- Each time that there has been an adjustment in the pretrial schedule the plaintiffs have lost time to work with their experts despite the fact that the modifications to the schedule have been 100% the fault of the Defendants.

- The PSC has been required to spend significant resources fighting with Defendants to get them to comply with the Court's orders and to make them produce the documents

---

[33] In fact, one deposition — the deposition of Dan DeLannoy — has been pulled down twice in this litigation.

they are required to produce instead of spending that time working up the case by reviewing documents and taking depositions to develop the evidence that our experts will need, including the evidence that will be needed to adequately take the depositions of the treating physicians in the selected bellwether cases.

- ▪ What else exists?  The current posture of discovery in this case is that Plaintiffs ask for things and Defendants deny the existence of what is sought.  Then Plaintiffs either "ask again" or discover the non-produced information on their own.  The prejudice that this has caused is massive and non-measurable.  This pattern is well-established.

It cannot be forgotten that the plaintiffs in this litigation are advanced in age and generally speaking, elderly.  Accordingly, any delays in discovery and trials will cause some plaintiffs to be incapacitated or even die before the trial dates can occur and given the number of cases involved in this MDL before they can have their day in court.  Based on the delays that have resulted from Defendants' actions to date, the PSC has grave concerns about being able to maintain the trial schedule that was put in place after spirited negotiations at the very outset of the MDL — which resulted in the PSC agreeing to limit the number of depositions that the PSC would take — and memorialized in CMO 6 and CMO 11. The PSC cannot help but wonder if these discovery delays are part of a plan by Defendants designed to prevent the bellwether trials from beginning in August 2014.

In light of the fact that the Defendants' repeated discovery violations have prevented the plaintiffs from properly developing the evidence needed to prosecute their claims, the PSC respectfully submits that an appropriate and proportional sanction would be preventing Defendants from pursuing their defenses to these claims.

## IV.    STATEMENT OF THE LAW

Rule 37(b)(2) of the Federal Rules of Civil Procedure governs the imposition of sanctions for failing to comply with a discovery order.  The Court has great latitude to formulate appropriate sanctions, and the Rule specifically states they may include:

**(i)** directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

**(ii)** prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

**(iii)** striking pleadings in whole or in part;

**(iv)** staying further proceedings until the order is obeyed;

**(v)** dismissing the action or proceeding in whole or in part;

**(vi)** rendering a default judgment against the disobedient party; or

**(vii)** treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

FED. R. CIV. P. 37

The most drastic sanction the Court can enter for a discovery violation is an entry of default judgment. *See Wellness International Network, Ltd. v. Sharif*, 2013 WL 4441926 at * 23 (7th Cir., Aug. 21, 2013). To place a defendant in default as a discovery sanction, the Court "must find by clear and convincing evidence that the party against whom the sanction is imposed displayed willfulness, bad faith, or fault." *Id.* Due to the severity of the sanction, the Court "must give at least the party's attorney notice and an opportunity to respond before entering a default judgment. . .but there need not be repeated warnings formalized in writing." However, "despite the severity of the sanction, a court is not required to issue less severe sanctions before deciding to enter default judgment. . . ." *Id.*

It does not appear that the "straw that finally broke the camel's back" needs to have been willful or in bad faith to support an entry of default. A sanction does not need to be considered in isolation, but rather can be considered in light of the entire procedural history of the case. *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011). The Court is able to look at "all the straws that the recalcitrant party piled on over the course of the lawsuit." *Id.* "[A]s soon as a pattern of noncompliance with the court's discovery orders emerges, the judge is entitled to act with swift decision." *Newman v. Metropolitan Pier & Exposition Authority*, 962 F.2d 589, 591 (7th Cir. 1992).

The Court has wide latitude to fashion a host of other sanctions under Rule 37, even in the absence of willfulness, bad faith or fault. *e360*, 658 F.3d at 642. The mere failure to comply with a discovery order alone is a sufficient basis to impose sanctions. The "culpability for that failure 'only determines which sanctions the court should impose and not whether any sanctions are appropriate at all.'" *Id.* The Court can also enter sanctions for discovery abuses, as it sees fit, pursuant to its inherent powers. *See Barnhill v. U.S.*, 11 F.3d 1360, 1367 (7th Cir. 1993); *Jones v. Bremen High School District 228*, 2010 WL 2106640 (N.D. Ill. May 25, 2010).

The touchstone of a Rule 37 sanction is proportionality, that is, the sanction should be proportional to the discovery violation. A district court has broad discretion in fashioning a

sanction in order to punish serial discovery misconduct that involves both violation of a court order and fault (willfulness or contumacious disregard is not required) on behalf of the non-compliant party. *Patterson v. Coca-Cola Bottling Co. Cairo-Sikeston, Inc.,* 852 F.2d 280, 283 (7th Cir. 1988). The district court must consider the gravity of the misconduct, the prejudice if any to the opponent, and whether the non-compliant party's position (on the merits) has any possible merit. *Bolt v. Loy*, 227 F.3d 854, 856-57 (7th Cir. 2000). No single factor is dispositive, or even necessary. Thus, by way of example, a district court's authority to dismiss a case is not dependent on a showing of prejudice by the defendant. *Daniels v. Brennan*, 887 F.2d 783, 788 (7th Cir. 1989).

A pattern of "willful delay and avoidance" constitutes willfulness, bad faith, or fault. *Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 191 (7th Cir. 2011). A court must have clear and convincing evidence of willfulness, bad faith or fault before imposing a harsh sanction such as dismissing a case. *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003).While the district court need not give prior warning of the possibility of imposing severe sanctions where misconduct is egregious, ordinary the court must warn that he is considering imposing such a harsh sanction. *Bolt v. Loy*, 227 F.3d 854, 856 (7th Cir. 2000).

It is beyond doubt that in the instances presented here, the Court has made it abundantly clear to the Defendants that the Court is contemplating a severe sanction. The district court need not attempt lesser sanctions first because a district court is not required to fire a warning shot;

Here, the PSC respectfully submits that the evidence of Defendants' pattern of conduct that has served to hinder discovery and their repeated violations of numerous Court's orders certainly shows clear and convincing evidence of willfulness, bad faith or fault making any sanction appropriate. [34]

A severe sanction will be reversed only if no reasonable person would have imposed such a sanction, and at a minimum the non-compliant party will have to show a good excuse for the dilatory conduct. The Seventh Circuit most recently addressed a dismissal as a sanction in *Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 190-91 (7th Cir. 2011). The court explained that the standard for imposing sanctions under Rule 41 is stricter than the standard under Rule 37. Rule

---

[34] In a case involving discovery violations and the failure of one party to adhere to court-orders, the Chief Judge of New York state's highest court made the following observation - which is analogous to the facts in this MDL:

> If the credibility of our Court Orders and the integrity of our judicial system are to be maintained, a litigant cannot ignore Court Orders with impunity. Indeed the Legislature, recognizing the need for Courts to be able to command compliance with their disclosure directives, has specifically provided that a *'Court may make such orders...as are just'* including dismissal of an action. Kihl v. Pfeffer, 94 N.Y.2d 118, 123, 700 N.Y.S.2d 87, 722 N.E.2d 55 (1999)

37 merely requires a finding of willfulness, bad faith, or fault on the part of the deficient party. The court explained that "even without a clear record of delay, contumacious conduct or prior failed sanctions, a court can apply the sanction of dismissal for Rule 37 violations with a finding of willfulness, bad faith, or fault." (internal quotation marks omitted).*Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 191 (7th Cir. 2011), *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003).

*Brown* is useful because it is recent and in it the Seventh Circuit placed the facts of that case between two others — one where dismissal was proper and another where it was not — and found the facts of *Brown* permitted the harsh sanction. The court wrote:

> In *Aura Lamp & Lighting, Inc. v. International Trading Corp.,* for instance, we did not find an abuse of discretion when a Rule 37 dismissal was based on a plaintiff's repeated failures to meet court-ordered deadlines despite several extensions, including "one final extension" and a warning that dismissal was impending. 325 F.3d 903, 904–906 (7th Cir.2003). While the court considered the fact that the attorney handling the appellant's case was a sole practitioner and was overwhelmed by the amount of discovery, it found that his request to find someone else to handle the case was too late at the time of dismissal. *Id.* at 908. Similarly, in *Watkins v. Nielsen,* this court held that a plaintiff's failure to meet deadlines despite several extensions, failure to heed a warning of dismissal, and submission of incomplete interrogatories warranted dismissal under Rule 37(b). 405 Fed. Appx. 42, 43 (7th Cir.2010).
>
> Conversely, this court found that the plaintiff in *Long* did not act with willfulness, bad faith, or fault when he missed a single court-ordered deadline because of the mistaken belief that a summary judgment motion suspended all other proceedings. *Long,* 213 F.3d at 985–87. In reaching this decision, the court explained that the "fault" portion of the Rule 37 standard is different than the "willfulness" and "bad faith" portions in that fault does not require intentional or reckless behavior, but counseled that fault "suggests unreasonable behavior" and it "does not include conduct that we would classify as a mere mistake." *Id.* at 987.

*Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 191 (7th Cir. 2011).While *Brown* involved dismissal of a compliant, the reasoning in *Brown* is equally applicable to the instant cases where dismissal of the complaint would not be warranted but striking answers or defenses would be.

The PSC respectfully submits that in this MDL Defendants' conduct appears more like the conduct in *Aura Lamp* and *Watkins* than the conduct in *Long* thereby making a severe sanction appropriate.

## V.  <u>CONCLUSION</u>

Based on all of the above, the PSC respectfully requests that the Court impose some remedy, including but not limited to sanctions against Defendants as a result of their repeated and consistent pattern of violating Court orders and refusal to provide discovery in a responsible and timely manner.  Based on the evidence herein, the PSC respectfully requests that the Court strike Defendants' answers in all cases in the MDL and entering judgment against Defendants.  If the Court does not agree because of the facts or the MDL process, the PSC leaves the appropriate sanction in the discretion of the Court.

The PSC also respectfully requests that the Court also shorten the time for Defendants to respond to the instant motion consistent with the Court's September 6, 2013 minute order requiring that (a) Defendants respond to the instant motion by no later than September 16, 2013 and (b) that the instant motion be set for a hearing on September 18, 2013.

PLAINTIFFS' STEERING COMMITTEE

By:  _____/s/ Roger C. Denton_____
Roger C. Denton
SCHLICHTER, BOGARD& DENTON, LLP
100 S. Fourth St., Suite 900
St. Louis, MO  63102
314-621-6115
rdenton@uselaws.com

Tor Hoerman
TOR HOERMAN LAW, LLC
101 W. Vandalia St., Suite 350
Edwardsville, IL  62025
618-656-4401
thoerman@torhoermanlaw.com

Seth A. Katz
BURG SIMPSON ELDREDG EHERSH &
JARDINE, P.C.
40 Inverness Drive East
Englewood, CO  80112
303-792-5595
skatz@burgsimpson.com

Michael A. London
DOUGLAS & LONDON
111 John Street, Suite 1400
New York, NY  10038
212-566-7500
mlondon@douglasandlondon.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Bldg. 3
Suite 100
San Antonio, TX  78257
210-447-0500
mwatts@wgclawfirm.com

*PLAINTIFFS' CO-LEAD COUNSEL*

Steven D. Davis
TOR HOERMAN LAW, LLC
101 W. Vandalia St., Suite 350
Edwardsville, IL  62025
618-656-4401
sdavis@torhoermanlaw.com

Mark R. Niemeyer
ONDER, SHELTON, O'LEARY &
PETERSON, LLC
110 E. Lockwood, 2nd Floor
St. Louis, MO  63119
314-963-9000
niemeyer@onderlaw.com

*PLAINTIFFS' CO-LEAD COUNSEL*

## CERTIFICATE OF SERVICE

The undersigned herby certifies that a copy of the foregoing was served electronically via the Court's ECF system on the 11th day of September 2013 to the following, including Defendants' Lead and Liaison Counsel, who are charged with coordinating service for all other Defendants counsel of record:

**Defendants' Lead and Liaison Counsel:**

**Paul W. Schmidt**
**Lead Counsel**
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 662-5272
pschmidt@cov.com

**Dan H. Ball**
**Co-Liaison Counsel**
Bryan Cave LLP
211 North Broadway
One Metropolitan Square, Suite 3600
St. Louis, MO 63102
(314) 259-2000
dhball@bryancave.com

**Eric E. Hudson**
**Co-Liaison Counsel**
Butler, Snow, O'Mara, Stevens and Cannada, PLLC
P.O. Box 171443
Memphis, TN 38187
(901) 680-7309
Eric.hudson@butlersnow.com

**Beth S. Rose**
Sillis Cummis & Gross P.C.
One Riverfront Plaza
Newark, NJ 07102
(973) 643-5877
brose@silliscummis.com

 _/s/  Roger C. Denton_____
Roger C. Denton