# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: PRADAXA (DABIGATRAN ETEXILATE) PRODUCTS LIABILITY LITIGATION | ) ) ) ) | 3:12-md-02385-DRH-SCW MDL No. 2385 |

This Document Relates to: All Cases

## DEFENDANTS' STATEMENT IN RESPONSE TO THE COURT'S 9/11/13 ORDER AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS AND OTHER RELIEF

In a lengthy motion filed eleven minutes before midnight only three business days ago,[1] Plaintiffs ask the Court to enter default judgment against Defendants Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") and Boehringer Ingelheim International GmbH ("BII").[2] Plaintiffs' motion does not fairly characterize the discovery record in this MDL and the relief they seek is inappropriate.

Defendants do not contest that there have been genuine issues with some of Defendants' document productions. These problems have not prevented the production of a massive volume of responsive documents in a relatively short time frame. More than twenty-seven million pages have already been produced, at an expense of more than 24 million dollars. Nevertheless, there have been problems that have led to the belated disclosure and production of documents. That, in turn, has caused the Court to raise concerns about Defendants' production.

---

[1] The Court had initially ordered Plaintiffs to file a memorandum on September 11, 2013 detailing the discovery problems to date. Defendants were instructed to respond on September 16, and a hearing -- at which several BIPI and BII counsel were required to appear -- was scheduled for September 18. At approximately midnight on September 11, Plaintiffs instead filed a thirty-seven page single-spaced motion for sanctions asking for a default judgment. In that motion, Plaintiffs asked the Court to shorten the amount of time typically provided for responses, thereby leaving the Defendants less than five days to respond to what Plaintiff's concede is a request for "drastic" relief. Mot. at 31. Defendants object to this shortened time to respond to a motion of this magnitude. Nevertheless, Defendants are complying with the Court's directive of September 12 to respond to Plaintiffs' submission.

[2] Both Defendants are grateful that the Court accepted their proposal regarding the appropriate in-house attendees at the September 18 hearing. Those attendees are the appropriate attendees in terms of their day-to--day oversight of and role in this litigation. However, upon reading the Court's order on attendees and further reflecting on the Court's concerns regarding discovery, Defendants also wanted to inform the Court that their respective General Counsels wish to attend in order to hear the Court's views and in an effort to help assure the Court that Defendants are aware of "the importance of compl[ying] with [the Court's] orders." *See* CMO 44 at 3.

Defendants and their counsel[3] take the Court's concerns extremely seriously. Defendants have already undertaken large-scale efforts in conjunction with the certification requirements imposed by CMO 37. Those efforts have led to the production of many of the documents for which Plaintiffs now seek sanctions. More recently, Defendants have further expanded their efforts to ensure the thoroughness and vigor of their production; in the wake of the Court's expressions of serious concerns about Defendants' production at the last CMC, Defendants commissioned a group of outside lawyers in both the United States and Germany to systematically re-check the past document collection practices to identify any potential additional gaps and to ensure that their productions are thorough and as complete as possible.

Ignoring Defendants' efforts to correct these problems, and without acknowledging the massive efforts that Defendants have successfully undertaken in a short amount of time, Plaintiffs seek to convert the legitimate areas regarding which the Court has expressed concern into an exhaustive catalogue of every discovery complaint they can articulate that literally runs through the full alphabet. Every issue, no matter how small or how remedied it is, has been included in their brief, whether the issue be receiving 4 pages of documents the day before one deposition or Defendants telling them a month-and-a-half in advance about a witness' impending retirement. And based on this listing, without any evidence of willful suppression or withholding, Plaintiffs ask the Court to enter a sanction that would ignore the merits of these cases and direct judgment for Plaintiffs.

Such a sanction is clearly inappropriate in this case. Ordering a default judgment is "an extreme sanction," typically only permitted in cases of "flagrant bad faith" or the "callous disregard" of responsibilities." *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643 (1976). The discovery issues in this case have not been the result of any attempt to mislead or deceive the Plaintiffs or the Court about the existence of responsive documents. They arise largely from a set of unintentional mistakes in Defendants' initial document-gathering efforts, which Defendants have since been working to fix. These issues require correction but, considered against the backdrop of the massive discovery effort Defendants have made in a compressed period of time, they do not fairly give rise to the inference that Defendants have willfully or recklessly impeded Plaintiffs' access to information needed to prosecute their claims.

Nor do these discovery issues reflect that Defendants treat this Court's orders with anything but the utmost respect. New discovery issues have recently come to light not because Defendants did not pay sufficient heed to the Court's orders to date, but rather because -- in attempting to respect the Court's mandates -- Defendants have uncovered earlier inadequacies, promptly disclosed those issues as the Court directed, and worked immediately to fix them.

---

[3] In a pattern of inappropriate attacks that permeates their brief, Plaintiffs' opening footnote alleges that the existence of separate lead counsel for BIPI and BII is a "charade" designed to deceive the Court, citing the fact that both lead counsel participate in defense efforts for both BIPI and BII. Defendants have been very clear, however, that both lead counsel would take a role in the defense of both entities. There has been absolutely no deception and the fact has never had any bearing on Plaintiffs' ability to pursue discovery or to pursue their case in general.

Moreover, any discovery sanction must be "proportionate to the infraction." *See Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 740 (7th Cir.1998). That is, the sanction must be in keeping with the nature of the discovery problem and the nature of the prejudice to the opposing party. Here, the discovery problem relates to a specific set of unintentional inadequacies that have delayed but not prevented the production of what, in context, is a relatively small set of documents. Indeed, the recent complaints that prompted this motion involve, by Defendants' count, well under 100,000 pages (most of them relating to the CSC and MSL documents). These late documents represent *substantially less than 1%* of the 27 million pages of paginated documents produced so far (not to mention the additional 585 gigabytes of other data).

Because of the vast quantity of responsive documents Defendants have already produced, and because Defendants have worked diligently to remedy all discovery difficulties as they arise, there has been no prejudice to Plaintiffs' ultimate ability to present their case on the merits. Indeed, Plaintiffs largely do not complain that Defendants have destroyed or withheld responsive documents, but instead that their access to those documents has been delayed. But Defendants have already taken steps -- such as paying the costs of a postponed deposition and making scheduling concessions with respect to others -- designed to alleviate these delays. Significantly, the bellwether trial dates remain unchanged. In this context, the sanction of default judgment is plainly inappropriate, and -- given the extensive remedial measures Defendants are already undertaking -- lesser sanctions are also uncalled for.

Finally, it is necessary to reiterate what Plaintiffs' motion obscures: the Federal Rules that govern the discovery process establish a reasonableness standard for document production efforts, not a perfection requirement. As this Court has previously observed, expecting Defendants to certify that every document production contains 100% of the requested documents and data is "simply not reasonable in light of the millions of pages of documents that are being produced and the number of individuals involved in producing the requested documents." CMO 38 at 8. Many of the instances to which Plaintiffs point may be considered discovery violations only under a perfection standard that does not exist under the law. More troubling, other alleged violations are based on a misleading or flatly inaccurate account of the facts by Plaintiffs. *See* n. 23.

For all of these reasons, Defendants respectfully request that Plaintiffs' motion for sanctions be denied.

## **FACTUAL BACKGROUND**

Specific problems have arisen in Defendants' discovery responses that have caused the Court concern and have required remedying. Defendants take those problems extremely seriously and address them below, along with the remedial processes they have already put in place. *See* Facts Part II.

Respectfully, however, the other issues that Plaintiffs raise are not fairly presented in their motion: those issues relate either to past events that Defendants have remedied, in at least one instance, with Plaintiffs receiving independent benefit as part of the remedy, *see* Facts Part

III; or they relate to issues that simply are not fairly presented and that call into question the entire basis for Plaintiffs' motion, *see* Facts Part IV.[4]  Before turning to the specific discovery issues, however, it is appropriate to review the substantial discovery efforts Defendants have successfully undertaken.

## I.    Defendants' Substantial Discovery Efforts

Notably absent from Plaintiffs' submission is any acknowledgment of the vast time, effort and expense Defendants have incurred in identifying, collecting, reviewing and producing Pradaxa-related documents, portable media, databases, repositories and other materials. Defendants acknowledge that there have been problems with specific aspects of their production, but those problems must be viewed in context.  As the Court has previously recognized, defects in Defendants' production cannot fairly be considered without also considering the broader scope of that production.  *See, e.g.*, CMO 38 at 8 ("The Court finds that the broad certification requested by the PSC is simply not reasonable in light of the millions of pages of documents that are being produced and the number of individuals involved in producing the requested documents.").

The numbers are staggering.  In the 11 months since they began producing documents, Defendants have produced more than 3.2 million Pradaxa-related documents consisting of over 27 million pages.[5]  Those numbers relate only to paginated productions.  Defendants have also produced numerous non-paginated productions (Oracle Clinical, SAS, and ARISg, to name a few) that consist of approximately 585 gigabytes of data.  For context purpose, one gigabyte is equivalent to approximately 20,000 web pages.  One-hundred-and-eighty pieces of portable media have been collected and produced as well.

This massive amount of information comes from the initial productions of 177 custodians and over 40 central sources, as well as supplemental productions for deponents and specific databases.

---

[4] Defendants are in an especially challenging position addressing these issues, given that plaintiffs have often presented them in an incendiary and unfair matter, prompting a court response before defendants even have a chance to respond.  *See* CMO 44 (addressing Sept. 11, 2013 letter of PSC related to documents from files of Dr. Friedman before Defendants could respond to that letter); Sept. 6, 2013 Minute Order (Dkt. 261) (ordering BII and BIPI in-house personnel to appear at Sept. 18, 2013 hearing based in part on PSC's Motion to Compel W. Hashad documents before Defendants' had filed response to that motion); May 30, 2013 Minute Order Staying the Enforcement of CMO 35 (Dkt. 201) (staying CMO 35 the same day as PSC's Motion for Reconsideration of CMO 35 was filed and before Defendants' Opposition to PSC's motion was filed and observing that "[i]f only a fraction of the allegations in the PSC's motion for reconsideration are true, the Court is troubled").

[5] For completeness, the specific numbers are 3,293,670 documents – or 27,457,698 pages.  These numbers treat multi-page documents produced natively as having only one page.  Approximately 80,000 documents have been produced natively, bringing the true page count for documents produced through the platform (Relativity) closer to, or more than, 30 million pages.

While most of the productions involve electronic data, the collection and production of this information is by no means automatic or fully automated. The identification, collection, review and production of documents and other data has required the continued involvement of numerous client resources, outside counsel resources, and vendor resources, to collectively scan paper documents, process electronic and paper documents and host the review platform, and review the documents.

For the overwhelming number of custodians, the process begins with completion of a questionnaire to flesh out the locations of potentially relevant paper documents, portable media and electronic data.[6] The questionnaire asks the custodian to identify all locations -- from laptops and personal drives to databases and share rooms--where Pradaxa related documents could reside. The responses form the basis for document collection and further follow up.

This process was complicated by the fact that Defendants had never faced a litigation or document collection process anywhere near the scale of the current effort. The company, outside of litigation, had no need for a centralized and institutionalized method of identifying each and every database and source of Pradaxa-related information. Thus, Defendants worked diligently to identify all sources of information within the companies that related to Pradaxa, but as is now evident, they missed a small number. This small number of errors should not be punished.

Document collection from BII custodians is further complicated by the applicable German data protection laws[7] and translation issues. When the production volume was at its height, Defendants had 300 reviewers in three different locations throughout the US reviewing Pradaxa documents and data. Litigation-related e-discovery costs to date are enormous; already they are in excess of 24 million dollars, and are increasing daily.

Although belittled by Plaintiffs, significant aspects -- but by no means all -- of Defendants' production efforts to date include:

- Production of relevant portions of Defendants' adverse event system, ARISg, via a virtual machine, in which Plaintiffs have the ability to run queries and work with adverse event data. This database could not be exported easily as Plaintiffs did not have access to Oracle, the platform on which ARISg runs. As a result, Defendants spent significant resources to develop a custom solution for this litigation within the time limit set by the Court.

---

[6] Defendants will produce a sample questionnaire for an *in camera* review at the Court's request. A few custodians, as part of an effort to produce their documents particularly quickly, were interviewed orally to obtain all responsive documents.

[7] Before documents can be collected from a BII custodian, the company must obtain his or her written consent. Otherwise, BII would be obligated under German law to redact all personal information from documents before production. (German law defines personal information very broadly in this respect, and imposes sanctions on those who violate its mandates.) Some German employees, unfamiliar with U.S. litigation, have expressed a reluctance to provide the relevant consents, and BII counsel have worked diligently to persuade the relevant custodians to grant such consents.

- Production of relevant portions of "BIPI's" TEMPO database containing marketing materials. This database could not be collected and produced in any traditional manner and BIPI engaged the services of two separate outside vendors to create a data set which could be produced to the Plaintiffs.

- Production of Defendants' clinical trial database (Oracle Clinical) and preclinical databases (BRAIN and Cerberus). Both BRAIN and Cerberus are extremely complex databases which include data and related Word, Excel and pdf documents. As with ARISg, a technologically sophisticated, custom solution was developed to provide Plaintiffs with a usable export.

- Production of the U.S. Pradaxa regulatory submission with working hyperlinks to save Plaintiffs time in having to locate documents manually within the submission. These hyperlinks had to be re-built by a technician on the production team because a working data repository cannot simply be copied and produced with the hyperlink functionality. Defendants, at Plaintiffs' request, are currently supplementing the Z Drive, an extremely time-consuming process.

- The collection and production of materials from BIPI's and BII's company-wide, central system drives (G: drives and T: drives, for which the electronic collection alone took more than two weeks because of the size of the repositories).

- Production of the responsive files of 177 custodians (62 from BIPI, 35 from BII, and the responsive files of 80 BIPI sales representative, Clinical Science Consultants and Medical Science Liaison custodians).

- To handle the review and production of non-English documents, Defendants engaged German and other translators, as well as two outside vendors, with the capability to translate electronic documents from many languages into English. When non-English documents have been translated, the translated portions of those materials have also been produced to the Plaintiffs -- thus saving them significant expense and time.[8]

---

[8] Defendants have produced over 3.8 million pages of documents that underwent machine translation, and for which Defendants produced both the foreign language and English translation. While the Federal Rules do not require that a party share its translation of documents ultimately produced, Defendants nevertheless voluntarily agreed to provide these machine translations as part of production CMO 3. The willingness to share this information saved the Plaintiffs considerable time and resources that would have otherwise been required for translation and review. In addition, Defendants also produced over 750,000 pages of foreign language documents that were not machine translated and were therefore reviewed by reviewers who spoke the native language. While the majority of foreign language documents were in German, Defendants have produced documents that involved translation of 40 different languages prior to production.

- Approximately 40 other databases/central source materials have been collected and produced from numerous other central sources in the U.S. and Germany, including but not limited to Vista, SAS data, Erooms, Igenbus, Rgenbus, Brains, BI-LIT, and Datavision.

These production efforts have required substantial time and resources during late 2012 and through 2013, as Defendants have worked diligently and in good faith to meet the production demands imposed by the very aggressive schedule requested by Plaintiffs.

Throughout these extensive efforts, Plaintiffs have repeatedly requested additional discovery. For example, Plaintiffs have repeatedly demanded new custodians for Defendants to search, having now identified 34 additional BIPI custodians and 16 additional BII custodians. Each of these production requests imposes substantial additional burdens and demands on Defendants' collection, review and production teams, requiring Defendants to reallocate resources and hindering Defendants' ability to adhere to the proscribed schedule.

## II. Defendants Have Had Problems With Their Productions, Which They Are Remedying.[9]

Defendants have had specific problems arise during document production that require remedying. The record demonstrates that these problems are not the result of bad faith or intentional deception and that they have not prevented Plaintiffs from prosecuting their cases. Rather, these problems are due primarily to Defendants' early production processes. In response to the Court's expression of concern regarding these problems, Defendants are undertaking a systematic audit and re-check of their earlier collection and production to test its completeness and remedy these problems promptly.

### A. Clinical Science Consultants (Allegation N)

One of Plaintiffs' principal complaints relates to Clinical Science Consultants (CSCs). As discussed further, Defendants failed to timely produce CSC data reflecting non-branded discussions with specific doctors (*i.e.*, discussions that did not touch on Pradaxa but that touched on the disease state Pradaxa treats). This error required correction, but it does not merit sanctions: (1) it has already been largely corrected; and will be fully corrected shortly; (2) the data Defendants recently discovered accounts for less than 2% of Vista records already produced; (3) there is no prejudice in terms of depositions, as no bellwether prescriber depositions have occurred and no CSC even called on a bellwether prescriber until after the alleged date of injury; (4) and there were extensive other timely productions regarding CSCs, such that their existence was plain. Further detail on these points follows.

---

[9] Defendants have addressed every complaint Plaintiffs put forward in their motion. They have not, however, adopted Plaintiffs' chronological presentation, which fails to distinguish between issues that merit discussion and grab-bag issues that are thrown in. For the Courts' ease, Defendants have therefore indicated the specific sections of Plaintiffs' brief that each portion of this response is addressing.

CSCs are a type of specialized sales representative who make up a very small portion of the overall sales force. For comparison, there are more than 2000 sales representatives, but there are fewer than 200 CSCs.

In November of 2011, more than a year after Pradaxa went on the market, CSCs began delivering unbranded disease state messages to health care providers concerning atrial fibrillation ("A-fib"), without specific reference to Pradaxa. However, the CSCs supporting A-fib began to receive specific questions from physicians about Pradaxa. To meet these prescriber needs, in September of 2012, CSCs received training regarding Pradaxa. As with all BIPI sale representatives, CSCs initially input data regarding their branded and unbranded interactions into the Vista database. As of July 1, 2013, CSCs began inputting their data into the successor database to Vista, Veeva.

Defendants' initial Vista productions contained all of the data entered into Vista that was coded as Pradaxa-related, including all of the CSC entries coded as Pradaxa-related. Defendants acknowledge, however, that these productions did not contain information about CSC interactions with healthcare providers that were entered into the database as A-fib-related. Specifically, while Defendants produced all entries in which sales representatives filled in the Vista "Product/Disease State" field by indicating the call had been Pradaxa-related, they did not produce those entries where the CSC filled in the field by indicating that the call concerned A-fib or other related diseases where there was no specific reference to Pradaxa.[10] *See* Extract from Vista Screen Shots, Exh. A.

The exclusion of the A-fib entries was entirely unintentional. For example, in the initial negotiations with Plaintiffs concerning the disclosure of the Vista database, the Vista screen shots provided by Defendants and used by both parties clearly revealed the "Product/Disease State" field. Defendants only realized that they had failed to produce non-Pradaxa disease-specific data in the course of performing due diligence with respect to Plaintiffs' questions about CSC interactions in bellwether cases. When Defendants realized that A-fib information had not been produced, Defendants promptly disclosed the information to Plaintiffs, and they have since provided Plaintiffs with all of the missing Vista information.[11]

_____

[10] Because of the structure of the "Product/Disease State" field, sales reps were not able to record a single entry as both Pradaxa and A-fib related. Thus, when CSCs were first transitioning to Pradaxa-specific interations, they often recorded two entries for a single interaction: one for the general A-fib portion of the call and one for the Pradaxa-related portion. *See, e.g.*, Vista Extract Showing CSC's Double Entry, Exh. B.

[11] Specifically, on August 30, 2013 (the Friday before Labor Day weekend), Defendants learned of the omission of the Afib data from Vista. Defendants contacted Plaintiffs' counsel over the weekend to discuss this development, but he was not available, so the call disclosing the missing information took place on Tuesday, September 3, 2013. On September 4, Defendants disclosed the omission to the Court at the CMC. *See* Sept. 4, 2013 CMC Tr. at 4-5, Exh. C. On September 7, Defendants provided Plaintiffs informally with the Vista export regarding the CSC Afib interactions for the bellwether cases. On September 10, Defendants formally produced the Vista (continued…)

There is absolutely no basis for Plaintiffs' allegations that Defendants intentionally hid the existence of this data or the existence of CSCs in general. As the PSC admits, from its earliest productions, Defendants have produced a range of documents that discuss, refer, or relate to CSCs. Further, as noted, the Vista data Defendants produced on December 17, 2012 contained over *5,000 records of interactions between more than 80 CSCs and health care providers* regarding Pradaxa. By the time of the second Vista supplement on July 2, 2013, there were approximately *20,000 records of such CSC interactions*. Each of these records specifically identified the sales representative having the interaction as a CSC. *See* Sample Extract from Vista CSC Records, Exh. D. No DFS failed to disclose any CSC who interacted with a physician specifically about Pradaxa.

There is also no basis for Plaintiffs' allegation that the unintentional omission of this data could somehow justify the entry of a default judgment in their favor. The omitted data accounts for less than 2% of the Vista records produced by Defendants. Bellwether preparation should not be materially affected because all of the CSCs related to the bellwether cases contacted the prescriber *after* the date of the injury alleged in the Plaintiff's complaint and fact sheet. In addition, no bellwether prescriber depositions have yet occurred, so these cannot have been affected. Defendants will soon produce the files of the four additional CSCs whose interactions with bellwether prescribers were brought to light by the new data. Plaintiffs cannot, therefore, demonstrate the prejudice to their merits case that would be required to justify sanctions.

## B.    Medical Science Liaison and Bold database (Allegations Q & T)

The other of Plaintiffs' principal complaints relates to the Bold database, which captures information on Medical Science Liaisons (MSL). As discussed further below, the failure to produce Bold was not intentional, and Defendants limited or avoided the harm to Plaintiffs from its late discovery by locating it early in the bellwether deposition process and producing it within 23 days of its discovery.

MSLs are not sales representatives. Rather, they are individuals with medical and scientific backgrounds whose role is to interact with health care providers who are deemed to be scientific experts and key opinions leaders. MSL interactions typically revolve around scientific exchanges and insights.

Until May 3, 2013, MSLs input data regarding these interactions into the Bold database.[12] There are two components to Bold -- data and documents. The data includes information regarding the health care provider and their respective interactions with the particular MSL. Documents housed in Bold consist generally of CVs of the health care providers and medical articles they have authored.

---

supplement. Defendants are currently expediting collection of the custodial files of the 4 additional CSCs identified in the supplemental Vista production.

[12] As of June 17, 2013, MSL interactions were captured in Veeva. MSL interactions between May 3 and June 17, 2013 were maintained in an excel spreadsheet while Veeva was being rolled out. The interaction data in the spreadsheet was subsequently input into Veeva.

Defendants do not dispute that the Bold database and relevant MSLs should have been identified and produced to Plaintiffs earlier in this litigation. Its non-identification was a mistake. What Defendants *do* dispute is Plaintiffs' incomplete and partially inaccurate description of the contents and production of Bold, their claim that the failure to disclose the database was intentional, and any claim that Defendants' mistake -- which they found and remedied -- merits sanctions.

On the evening of August 7, defense counsel learned of the Bold database. Defense counsel disclosed this new information to the Plaintiffs and the Court the morning of August 8. *See* August 8, 2013 CMC Tr. at 5-6, Exh. E. The database was not disclosed initially because it was one of the few sources of information that was missed when Defendants were identifying the databases, central sources and other repositories containing documents and information related to Pradaxa. As stated above, the company had no centralized system to identify all applicable databases, so the sources for collection had to be identified through individual contacts with individuals across multiple departments in the U.S. and Germany. This process successfully identified the vast majority of the sources of information and indeed resulted in the production of the vast quantity of documents and data described above. Unfortunately, the Bold database was missed. As the Court suggested at the August 8 CMC when the Bold issue was disclosed by Defendants (the morning after outside counsel learned of the database), this type of mistake can occur in document productions of this magnitude. Defendants did not fail to disclose Bold because of any bad faith. To the contrary, Defendants' good faith is exemplified by their prompt disclosure of the new database and its speedy production.

Defendants also acted quickly to remedy this deficiency. Defendants investigated the contents of the database and on August 10 shared with the PSC the information learned. On August 19, Defendants provided screenshots of Bold to Plaintiffs' counsel. *See* Aug. 19 Email to S. Katz, Exh. F. On August 21, Defendants identified three MSLs[13] who called on bellwether prescribers and provided a detailed explanation of the Bold export along with samples of the production. *See* Aug. 21 Email to S. Katz, Exh. G. On August 23, Defendants produced the responsive data in Bold. On August 30, Defendants produced the responsive documents in Bold, the Bold side of "Veeva," and the custodial files of all three MSLs. *See* Aug. 23 Production Cover Email, Exh. H. Thus, the error regarding Bold was remedied within *23* days of its discovery.

Contrary to Plaintiffs' allegations, there is no evidence that the failure to identify Bold and the MSLs earlier was anything other than an inadvertent oversight. Plaintiffs note that the DFS requires production of payment information to physicians on BIPI speaker bureaus, and that Bold contains a "payments" field. Plaintiffs then argue that Defendants "surely" had to have discussed with their lawyers the source of the payment information "namely within the Bold database." Mot. at 21 n. 22. Yet Plaintiffs know that payment information is not maintained in Bold. Plaintiffs fail to disclose that when Defendants provided a description of Bold to the PSC, Plaintiffs were specifically advised that "[a]lthough there are tabs in the spread sheet labeled 'Payments' and 'Objectives,' those tabs are not used in Bold. Thus the data for those fields will

---

[13] The MSLs were: Hanbo Hu, Mark Kaldas, and Nirmala Renganathan.

be blank for all of the profiles in the 9 spreadsheets." *See* Aug. 21 Email, Exh. G. Further, to the extent it is unclear form Plaintiffs' brief, Defendants have provided the payments information as required by the DFS. *See* Primus DFS, Exh. I. That information comes from multiple locations - - not Bold.

### C.  deLannoy Day Planners and Certification Issue (Allegations L & Y)

As outlined in Defendants' September 6 letter to the Court, Defendants failed to produce Dan deLannoy's personal day planners in a timely fashion. These day planners contain references to Pradaxa and other information. Mr. deLannoy indicated that when his documents were originally collected, he did not appreciate that these day planners were covered by the efforts to collect his Pradaxa-related documents. *See* Declaration of D. deLannoy, Exh. J. This mistake should not have been made. But, within 30 minutes of recognizing this oversight, the PSC was notified. *Id.* Defendants are also paying Plaintiffs' travel costs incurred in attending the deposition to mitigate the harm of the error, in addition to paying Judge Stack's travel costs and time. And, while not excusing the mistake, Defendants note that the 5000 pages produced (many of which are blank or contained no information about Pradaxa) represent less than 2% of the 300,000 pages of Mr. deLannoy's material that was previously produced.

### D.  Delays in Bellwether Productions (Allegation N)

Plaintiffs cite a late production of three sales representative files and claim (with no support or specifics) that Defendants have delayed in confirming sales rep depositions. The first allegation is confined to three sales reps with limited documents that Defendants only found by taking additional proactive searches for their documents; once Defendants found these documents, they promptly produced them before any sales rep deposition occurred. The second allegation is simply untrue.

**Three Sales Rep Files:** Defendants acknowledge that they belatedly produced documents from three sales representative files related to two bellwether cases. Still, the facts are not nearly as dire as Plaintiffs suggest. Mary Halpin, Darren Ott and David Spicehandler were all employees of the independent contractor inVentiv. All three sales representatives stopped detailing Pradaxa in January 2012, before the current litigation was initiated. Defendants had contact information for Ms. Halpin and Mr. Ott, as both of them had previously worked for BIPI, but Defendants had no contact information for Mr. Spicehandler as he only worked for inVentiv. During their initial collection effort, Defendants spoke to Ms. Halpin who advised that she no longer had any documents related to Pradaxa. Mr. Ott did not return calls.

The initial search for electronic information (email, user share and workstation) yielded the workstation of Mr. Ott, which was timely produced on July 31, 2013, pursuant to Amended CMO 28. Shortly before this production, out of an abundance of caution, Defendants performed a supplemental search of an "offline" mail archive system. They located email for the three sales representatives. By August 1, 2013, Defendants had disclosed that the email had been located and was being collected. *See* Aug. 1 Email to R. Denton et al., Exh. K. This disclosure was in numerous subsequent emails regarding document production until the documents were produced on August 26, 2013. *See* Production Emails to R. Denton et al., Exh. L. The volume of documents produced was quite low: Halpin - 193 pages; Ott - 153 pages; Spicehandler - 215

pages. Defendants cite to the low page count not as an excuse for the late production. Defendants acknowledge that the email for Ms. Halpin, Mr. Ott, and Mr. Spicehandler was produced late. Rather, Defendants submit that this late production should be viewed in the context of the balance of the otherwise timely production of sales reps' custodial files on June 30th: 44 sales reps covering 60,517 documents; and July 31: 27 sales reps covering 19,706 documents. In addition, Plaintiffs were notified that additional documents had been located long before they even requested depositions of the reps, and long before any sales rep depositions occurred.

**Sales Rep Depositions:** Plaintiffs' allegation that Defendants have been unwilling to schedule sales rep depositions is simply not true. From June 21 to August 27, Plaintiffs requested a total of 11 sales rep depositions, seven of which have either taken place or have confirmed dates. *See* June-August Deposition Scheduling Emails, Exh. M. As to the other four, one request was withdrawn, one sales rep was offered for five different dates but Plaintiffs have neither accepted any of the dates nor offered any alternatives, and two sales reps are former employees who are not under BIPI's control (but whom BIPI is nevertheless working to schedule). *See* Unscheduled Deposition Emails, Exh. N.

Although Plaintiffs have been free to request sales rep depositions since late June, the large majority of their requests have come in the past three weeks. Since August 28, Plaintiffs have requested 17 more depositions. *See* Deposition Request Emails, Exh. O. Defendants are working diligently to schedule these depositions, a substantial effort that requires the coordination of witness and attorney schedules. In many cases, the sales representatives Plaintiffs seek to depose are former employees of the company and/or employees of another pharmaceutical company, which presents additional logistical challenges in contacting them and arranging for their deposition.[14] Despite these challenges, BIPI has scheduled or offered dates for nine more sales reps. *See* August 28-September Deposition Scheduling Emails, Exh. P. Of the ten sales reps for whom BIPI has not yet offered a date, eight are former representatives not within the company's custody or control, and one was requested in the last few days.[15]

---

[14] Defendants have not offered dates for one current employee only because they have agreed with Plaintiffs to conduct this deposition on the same day as the other sales rep requested for the same bellwether case, and have yet to locate or make contact with the other rep, who is a former employee.

[15] Although Plaintiffs devote significant time to faulting Defendants' production efforts, they have a number of production problems on their end that, under their standards, would justify sanctions. Early examples include:

- Consortium Plaintiff John Hawkins destroyed relevant communications with his wife's treating physician because, as he testified, he was never instructed by his lawyer to preserve any materials. *See* Hawkins Dep. Tr. at 21:12 - 23:3. Similarly, Plaintiff Georgia Primus discarded a calendar containing relevant medical information. *See* Primus Dep. Tr. At 56:19-57:7, Exh. U.

(continued…)

E.    **Ask BI Blog (Allegation W)**

Plaintiffs contend that BIPI wrongly failed to disclose a blog that was discontinued, without being preserved, when the Microsoft Sharepoint site that was used for the blog was taken down in May 2011. As detailed in BIPI's Opposition to the Plaintiff's Motion to Compel (Dkt. 264) and the accompanying Declaration of John Yonsky, Exh. K, the Ask BI blog was simply taken down when a new version of a blog, entitled Employee Connect, went into effect replacing the use of Ask BI. As a Microsoft Sharepoint site, the contents of the blog were not captured or otherwise preserved when the Sharepoint site was taken down. Nothing associated with this is reflective of any failure to comply with appropriate preservation steps and there was no bad faith. *See* BIPI's Opp. to Pls' Mot. to Compel at 11.

Counsel for BIPI separately informed Plaintiffs on Wednesday, September 11, 2013, that it had obtained all of the blog posts for the successor to the Ask BI blog, entitled Employee Connect. *See* Sept. 11 Email to S. Katz et al., 2013, Exh. W. BIPI's counsel had previously informed Plaintiffs of the existence of the Employee Connect blog site after Plaintiffs asked about the Ask BI blog. On initial and subsequent inquiries on this topic, BIPI's counsel learned that the Employee Connect site had been removed from service and had not been preserved, but BIPI was able to identify emails contained within the previously collected custodial files. (These were "spam" type emails that alerted certain employees to new posts on the Employee Connect site.) BIPI conducted a review of materials and determined that none of these related to Pradaxa. BIPI reported that information to Plaintiffs' counsel on August 27, 2013. *See* Aug. 27 Email to

- Plaintiffs Adelaine Kohn and Ross Butler both produced relevant materials for the first time during their depositions. These documents were responsive to the Fact Sheet and should have been produced along with the Fact Sheet, as ordered by the Court. *See* Kohn Dep. Tr. at 16:2-18:8 (producing email correspondence relating to Pradaxa at the deposition, and admitting that the version produced was an incomplete copy of what Mrs. Kohn had available at home); Butler Dep. Tr. at 6:24 - 9:19 (producing relevant calendars and Pradaxa bottle during the deposition), Exh. U.

- Plaintiff Edward Stair produced a substantially modified Fact Sheet midway through his deposition. Although the modified version was created before the deposition, Plaintiff's counsel did not produce it in advance, nor did Plaintiff's counsel bother to bring an extra copy to the deposition for defense counsel. *See* Stair Dep. Tr. at 35:12-38:4; 116:23 - 117:4, Exh. U.

- Plaintiff Eva Smith belatedly produced a diary containing information relevant to her claims over a week *after* her deposition, thereby preventing Defendants from questioning her about the diary entries. *See* August 8, 2013 Email from Steven Davis, Esquire, Exh. V.

-  Plaintiff Mary Myers has failed to produce a responsive list of her medications, even though her caretaker testified that he maintains such a document. *See* Fralick Dep. Tr. at 46:17- 48:2. Plaintiff Georgia Primus similarly has not produced receipts from relevant hospitalizations that she testified she believed she possesses. *See* Primus Dep. Tr. at 324:13-325:5, Exh. U.

S. Katz , Exh. X  BIPI's counsel again followed up on this topic, and after doing so learned that an individual within BIPI had discovered two spreadsheets that contained the Employee Connect posts -- some of which mentioned Pradaxa.  On the same day that counsel discovered this information, the spreadsheets were provided to Plaintiffs.  *See* Sept. 11 Email, Exh.Y.  Counsel has since determined that nine of the blog posts reference Pradaxa and that there are 36 comments related to Pradaxa.  BIPI's counsel also alerted Plaintiffs to the fact that the two spreadsheets were stored on the G drive -- which had previously been collected and produced.  After reviewing the G drive production and determining that the two spreadsheets were not included in the collection, BIPI immediately undertook an analysis of the G drive collection to determine whether any other materials may have been missed.

### F.    Defendants' Diligent Efforts to Remedy these Problems

While Defendants have attempted to provide the Court with a full explanation of the above production issues, they do not dispute that these issues need to be fixed.  Indeed, even before many of the recent discovery problems came to light, Defendants had inaugurated an extensive process for certifying productions in compliance with CMO 37.  More recently, spurred by the concerns raised by the Court at the recent CMC, Defendants have increased their efforts even further, commissioning a group of outside lawyers to systematically recheck the previous document collection process.

When the Court ordered that Defendants certify the completeness of productions, lead counsel for BIPI and BII took immediate steps to comply with the Court's order.  For example, because of BIPI lead counsel's lack of personal involvement in the majority of the Defendants' prior production activities, both lead counsel first made a diligent inquiry into the processes involved in making a document production.  This inquiry included discussions with the responsible in-house personnel regarding the steps followed to collect electronic and hard-copy documents, discussions with the vendors responsible for scanning and processing documents regarding their processes, and a discussion with LeClair Ryan regarding the document review process.  Having received this overview of the document collection and production process, lead counsel then confirmed, before each certification, that those principally involved in the collection, processing, and review of the documents did not have doubts about the completeness of each production to which was to be certified.  Lead counsel also requested that those attorneys meeting with witnesses ask to be sure all of the witness's documents have been collected.

In fact, it is through this certification process that some of the problems of which Plaintiffs now complain were identified, disclosed, and corrected.  For instance, counsel for Defendants learned of previously uncollected documents from the files of Mary Sullivan and Dan deLannoy when meeting with these witnesses, promptly disclosed these issues, and produced the documents.

Nonetheless, in light of the recent discovery of Bold, the Afib CSC data described above, and the DeLannoy incident, BIPI and BII are taking additional steps to identify any additional issues that may exist in the document production.  In coordination with senior in-house management, Defendants have begun a comprehensive re-check of the completeness of the document collection and production efforts to date.  This process was initiated immediately after the Court's comments after the September 4 CMC and before the Court's order of September 6.

To conduct this re-check, Defendants have assembled a team of five attorneys to lead an in-depth assessment of the document collection and production process. The team started by reviewing the general collection process with in-house personnel. The team is also in the process of interviewing every witness who will be deposed to ensure that all these witnesses' documents have been collected. To identify and confirm the collection of all shared document sources and databases that may contain responsive material, the team will ask these custodians about their document management practices and the databases these custodians use.

To be clear, these witnesses have already been asked about where any of their documents might reside as well as the drives and databases that they used. The re-check process is designed in part to verify work that has already been done, in case retreading old ground reveals sources that the witnesses originally overlooked.

The team will also interview individuals at BIPI and BII to focus on the companies' databases. If any issues are identified during the course of this review, the team will immediately work to address them.

Given that no process can achieve perfection, and that the prior problems indicate at least some gaps in the initial collection process, there may be additional document issues identified that will need to be addressed. In fact, the most recent efforts to scrutinize past productions have already revealed additional areas in which supplementation may be necessary. Specifically, the G drive collection effort, despite producing over 3.5 million pages, appears to have missed some responsive material, as noted in the discussion of Ask BI, *supra*. There are also potential issues with respect to Klaus Dugi's work station, and at least one sales rep will require minor supplementation as well.

Defendants are obviously aware that the discovery and disclosure of these additional production problems, as well as any further issues that may be uncovered by the audit process, could give more fodder to Plaintiffs' complaints. Defendants' senior management nevertheless ordered this project to proceed and to proceed with the utmost transparency with respect to any difficulties uncovered. Defendants respectfully ask the Court to view the decision to undergo this process and the resultant issues that may be identified in the spirit in which the project has been commissioned -- a desire to take whatever steps necessary to correct any prior problems in the document process and to finally put these issues behind us.

Defendants have also willingly assumed other detrimental consequences of their discovery problems. To cite two examples: Defendants have acceded to a new Plaintiff-driven schedule with respect to bellwether depositions (with plaintiffs having the option to depose sales reps before prescribing doctors, if this can be arranged in a timely and reasonable manner), and Defendants have acquiesced in Plaintiffs' new discovery requests even when -- as in the case of the Friedman retirement documents -- they are not apparently responsive or relevant. Defendants are well aware that their past discovery problems may weaken their future position. For that reason (as well as Defendants utmost respect for the Court), they are committed to resolving them. But also for that reason, Court-imposed sanctions are neither appropriate nor necessary in this situation.

## III. Production Issues That Were Resolved Months Ago Do Not Merit Sanctions

Defendants faced early challenges in their document production that they have since devoted substantial resources to fixing. These issues have been remedied through agreements with Plaintiffs and through certain court orders. With those problems remedied, often at great burden to Defendants, it is unfair and unreasonable for Plaintiffs to cite those past problems now as a basis for sanctions.

**A. Production Delays in the Initial Stages of MDL Discovery (Plaintiffs' Discovery Allegations II. A-F)**

BIPI acknowledges there were shortcomings in Defendants' early document productions that Defendants subsequently rectified. Plaintiffs repeatedly complained that the productions of custodial files in 2012 were not made quickly enough, and counsel for BIPI was called before this Court on November 19, 2012, following accelerated briefing, to address the timing of its document production.[16] At that in-chambers hearing, Plaintiffs argued for custodial productions to begin November 30, 2012, and BIPI's counsel asserted that the imposition of such a deadline would compel BIPI to produce documents from its employees' custodial files without any privilege review. Following argument, the Court entered an order including a deadline for the production of the category "A" custodians' electronic materials and the paper files of 28 custodians to be produced on November 30, 2012. BIPI then completed the electronic collection and processing of custodial files and, in an effort to comply with the Court's order, produced custodial documents for the initial custodians without the benefit of any review for responsiveness or privilege. BIPI continued its efforts to meet the deadlines imposed by this Court in CMO 17 throughout December.

Certain custodial file productions were, however, incomplete and Plaintiffs submitted a letter to this Court on January 2, 2013 complaining that BIPI had missed production deadlines. *See* Pls' Mot. Exh. 27. Counsel for BIPI addressed the letter at the January 14, 2013 status conference and were able to represent to the Court, with the agreement of Plaintiffs' counsel, that the discovery process was on track:

> MR. RICHMOND: . . . Your honor, one other matter just briefly. By letter dated January 2nd, 2013, the Court was informed that a [sic] BIPI essentially missed some deadlines with respect to production of documents, and the letter was such that it was not that BIPI necessarily missed the production deadlines, but there were documents that were not produced that were supposed to be

---

[16] It is worth noting that, although Plaintiffs were claiming that initial custodial document production was intolerably delayed, Plaintiffs did not reach agreement with Defendants with respect to the search terms to utilize in certain electronic productions—including production of some electronic materials in custodial files—until early November, 2012. No custodial files could be produced until the search terms were agreed to. *See* BIPI Response to Plaintiffs' Scheduling Mot. at 4-5 (Dkt. 65). While the Plaintiffs were complaining to this Court about the delay in BIPI's initial custodial production, counsel for BIPI was negotiating with the Plaintiffs in an attempt to avoid the unnecessary use of some search terms proposed by Plaintiffs, including expletives. *See* Nov. 13, 2012 Email to S. Katz, Exh. Z.

> produced by the various dates. The reality is, Your Honor, that, as I
> indicated a moment ago, there have been continuing discussions
> with counsel for plaintiffs regarding the document production.
> Those discussions have been very amiable, and I believe that the
> letter to Your Honor simply resulted from some
> miscommunication amongst the plaintiffs' lead lawyers regarding
> those communications.
>
> I said, on behalf of my client and my team, there certainly was no
> intention to violate any order of this Court, and so we want to
> make that clear to Your Honor.   And we appreciate plaintiffs'
> counsel as well in their understating on those various issues related
> to production.
>
> THE COURT:  Thank, you, Mr. Richmond. Mr. Watts?
>
> MR. WATTS:  Yes, sir. Mikal Watts.  While the issue whether
> there was a miscommunication or not may be debated, I think that
> what's not debated is everybody believes the process is on track.
> Everybody's been pushing hard. But we certainly would state at
> this time that we believe everybody's operating in the best interest.

Jan. 14, 2013 CMC Tr. 6-7, Exh. AA.

During and following the production of the initial 28 custodians, Plaintiffs requested the custodial files of an additional 34 custodians from BIPI.  Other than objecting to the production of the custodial file of an employee who worked on a potential pediatric indication for dabigatran -- which bears no relation to the claims in this litigation -- BIPI voiced no objection to the production of these materials and instead only asked that the productions occur on a timeline that permitted the continued review and production of the other database and central source materials which had already been requested.  Although the parties reached agreement on some of these productions, others were addressed by this Court.  *See, e.g.*, Feb. 7, 2013 CMC Tr. 2-10, Exh. BB; *id.* at 9 (Court noting that "[M]y concern, greatest concern, is that each side be working diligently in exercising good faith to comply with the Court's orders, and it is my finding that the defendant has been doing that. . . .").

In the fall of 2012, Plaintiffs also voiced complaints about the format of early productions and, just as Defendants worked to rectify the problems associated with the custodial collection efforts, BIPI worked diligently and in good faith to address these contentions.  For example, BIPI made its initial NDA/IND production in September 2012.  BIPI produced the NDA/IND materials in the PDF format in which they were originally stored in an internal database. Following this production Plaintiffs raised questions about text searchability and certain metadata related to the NDA/IND and the fact that the PDF version of the documents showed the existence of hyperlinks to move between documents within the NDA/IND materials, but the hyperlinks could not be utilized in the PDF format.  Following a meet and confer over these issues, BIPI undertook two efforts to address the Plaintiffs' complaints.  First, BIPI undertook the process to supplement the initially produced NDA/IND materials with additional Optical

Character Recognition ("OCR") text so that the searchability of the PDF would be improved. BIPI also provided additional metadata for these materials. These materials were produced between November 14-21, 2012. Second, BIPI collected and produced the IND/NDA materials in the format as they existed within the company system used for submissions to the FDA (the Z-drive). With the assistance of an outside document technician, the hyperlinks from the materials pulled from the Z-drive were rebuilt to insure that Plaintiffs were provided a production with hyperlinks that allowed the Plaintiffs to navigate within the document through the working links. The Z drive materials were produced on January 14, 2013. Through these productions, Plaintiffs were provided with two sets of the NDA/IND materials -- one in PDF format with improved OCR searchability and one with the hyperlinks that existed in the submissions provided to the FDA.

Finally, it should be noted that Plaintiffs' account of the difficulties in the early MDL discovery process is not fully accurate. Plaintiffs assert that BIPI and BII failed to disclose the names of individuals involved with Pradaxa. *See* Mot. at 7. That is incorrect. In addition to providing the Plaintiffs a list of 28 custodians for potential collection and prioritization in October of 2012, BIPI also produced, in early November, both organizational charts and specific summary information related to numerous employees who had involvement with Pradaxa. *See* Nov. 3, 2013 Pharmacovigilance Email to M. Watts, Exh. CC; Public Relations Email, Exh. DD; Marketing Email, Exh. EE. Accompanying the organizational charts for Pharmacovigilance, Marketing and Public Relations, BIPI provided a narrative it had prepared identifying each of the employees within the respective departments that worked on Pradaxa, and describing these individuals' roles. *Id.* Contrary to Plaintiffs' contention that these employees were not identified until a 30(b)(6) deposition or that Plaintiffs had to uncover the names of these individuals themselves, *see* Mot. at 8, a significant majority of the allegedly undisclosed individuals listed in Plaintiffs' brief were specifically disclosed in these materials and the organizational charts provided at Plaintiffs' request. *See, e.g.*, Pharmacovigilance Email, Exh.CC (identifying Dr. Cornejo as the Senior Associate Director within BIPI's Global Pharmacovigilance Center within the US, and stating that he worked on PADER and in the cardiovascular therapeutic areas as a risk management physician).

BII also produced organizational charts in its December 2012 response to Plaintiffs 30(b)(6) notice. Additional organizational charts were also supplied in March of 2013 in connection with the 30(b)(6) depositions of BII's corporate organization, regulatory, safety and clinical/medical witnesses, and in May 2013 prior to the 30(b)(6) deposition of the marketing witness. These disclosures took place well in advance of any requests for other BII depositions.

Moreover, to the extent Plaintiffs suggest that Defendants' initial disclosure are inadequate, they are simply wrong about the law. Rule 26 requires that each party disclose those individuals "that the disclosing party may use to support its claims or defenses," not every individual the opposing party might ever wish to investigate or depose.

## B. Events Surrounding the Implementation of CMO 37 (Allegations G, I-J, O)

Plaintiffs devote multiple sections of their motion to the events surrounding the implementation of CMO 37. That order was entered in response to a June 28, 2013 letter from Plaintiffs detailing certain difficulties with the supplementation of custodial files and the

production of highly confidential documents. Prior to that letter, Defendants had gone to great lengths to work with Plaintiffs to address their concerns, engaging in a thorough investigation of the circumstances surrounding the relevant custodial productions. *See* July 8, 2013 Letter to the Court, Exh. FF. Through those investigations, Defendants were able to demonstrate that Plaintiffs' initial statements about the scope and reach of the supplemental productions were largely unfounded. Plaintiffs nonetheless filed their letter with the Court, and Defendants provided the Court with a comprehensive response. After considering both submissions, the Court found that "some of the supplemental productions may have been made for legitimate reason," but it also found that the absence of notice to Plaintiffs with respect to the need for supplementation, as well as the lack of clarity with respect to Defendants' decision to withhold highly confidential documents, were sufficient to merit the certification requirement that the Court imposed. *See* CMO 38. Thus, the Court ordered Defendants to certify each production and it entered a revised schedule for supplemental productions that requires Defendants to produce such supplementation 15 days earlier than previously required. *Id.*

Defendants have already suffered the consequences of the discovery difficulties that led to CMO 37, and they have taken the resulting Court order extremely seriously. *See* Section III.F (detailing Defendants' efforts in conjunction with certification). Plaintiffs nevertheless provide a detailed recap of the assertions set forward in their June 28, 2013 letter. In doing so, Plaintiffs omit several key facts and misrepresent other details that must be corrected.

### 1. Supplementing the Files of the First BIPI Deponents

Plaintiffs reassert their claim that Defendants violated CMO 8 by failing to supplement the custodial files of BIPI's first four witnesses in advance of their depositions. *See* Mot. at 9. This simply is not true. As Plaintiffs admit, CMO 8 only requires supplementation if "plaintiffs notify counsel for BIPI at least 60 days in advance of the intended deposition." *See* CMO 8 at 11. Plaintiffs did not provide such timely notification for at least three of the four witnesses they cite. More egregiously, Plaintiffs were obviously aware of this when they filed the instant motion since the paragraph in which Plaintiffs allege Defendants violated CMO 8 also contains the dates that prove Defendants did not: First, Plaintiffs allege (without evidentiary support) that they notified Defendants of Paula Palmer's deposition "in early January of 2013." Mot. at 9. They also state that her deposition took place on February 28 and March 1. *Id.* In fact, Plaintiffs notified Defendants of their intent to take Ms. Palmer's deposition on January 14: a date only 45 days in advance of the deposition. *See* Jan. 14 Email from M. Watts, Exh. GG. Further, according to the motion and their own exhibit, Plaintiffs emailed Defendants on March 13, 2013 to notify them of Plaintiffs' general intent to depose, among others, Laszlo Szanka, Timothy King, and Robert Johnson. *See* Pls' Mot. at 9 and Pl. Exh. 33. Mr. Szanka's deposition began on April 29, 49 days after the notification was sent. Timothy King's deposition began on May 6, 55 days after the notification. And while Bob Johnson's deposition did occur more than 60 days after this general notification, Plaintiffs only made a specific request for his deposition dates on March 29, again less than 60 days before the deposition occurred. *See* Mar. 30 Email from M. London, Exh. HH. Further, Plaintiffs first raised this issue on June 28, 2013, more than a month after all the relevant depositions had been completed, almost certainly because they recognized at the time of the depositions that supplementation hadn't been warranted. At any rate, any supplement for Mr. Szanka or Mr. Johnson would have been minimal because both were former employees.

## 2.    Postponement of BIPI Depositions for a Period of 60 Days and Entry of CMO 37

Plaintiffs also misstate the record with respect to the depositions that were postponed and the entry of CMO 37. Most dramatically, Plaintiffs allege that, before the entry of CMO 37, Defendants' "repeatedly failed to certify the productions in violation of Fed. R. Civ. P. 26(g)." *See* Mot. at 12. But Defendants were (and remain) fully in compliance with Rule 26(g)'s certification requirement: Defendants have always signed "every discovery request, response, or objection," and that is the only certification the rule mandates. *See* Fed. R. Civ. P. 26(g).

Further, Plaintiffs suggest that issues with Defendants' supplemental productions caused the cancellation of nine depositions. In fact, Plaintiffs agreed to postpone these depositions as part of a broader agreement with Defendants in which -- among other things -- Defendants agreed to the vacatur of CMO 35 and Plaintiffs agreed to the vacatur of CMO 31. *See* July 9 CMC Tr. at 30:10-31:1. This brought significant benefit to Plaintiffs, who were in the process of seeking reconsideration of CMO 35 because it was "extremely burdensome on Plaintiffs and greatly prejudic[ial] to the PSC's case development." Pls' Mot. for Reconsideration of CMO 35 (reflecting the Plaintiffs view that CMO 35 was). Plaintiffs negotiated an agreement in which they obtained a specific benefit -- the voiding of CMO 35 -- and now seek to use what they bargained for that benefit -- postponement of depositions -- as a basis for sanctions. The Court should not allow such gamesmanship.

Finally, Plaintiffs complain about the delayed production of documents because of the highly confidential review process. That topic was thoroughly briefed in July and was a subject of the July 9 hearing and the July 10 Court Order in connection with CMO 37. The documents at issue were produced some time ago, and the issue has been fully resolved. It is not appropriate to again raise that same conduct in support of another motion for sanctions.

Again, Defendants do not dispute that there were discovery difficulties that led to the entry of CMO 37, and the Court has imposed consequences for those difficulties, but Plaintiffs should not now be permitted to seek sanctions for issues that have already been fully addressed.

## 3.    Production of Mary Sullivan's Handwritten Notes  (Allegation O)

Plaintiffs' recitation of the events around the production of Ms. Sullivan's notes also contain several material misrepresentations that must be corrected. First, Plaintiffs falsely state that "[t]his discovery violation *has not* been previously identified to the Court." Mot. at 18 n. 18. In reality, the Court was informed of this discovery issue in writing on August 1, 2013, in Mr. Schmidt's certification letter.[17]  *See* Aug. 1, 2013 Certification Letter, Exh. II. Not only did

---

[17] The August 1, 2013 certification letter states:

> BIPI made a supplemental production of Mary Sullivan's files on July 17, 2013. After making this production, BIPI learned of additional responsive materials maintained by the custodian, which BIPI included in its July 31, 2013 production. Although Ms. Sullivan's paper documents were collected by BIPI on November 4, 2012, and again on July 15, 2013, Ms. Sullivan notified company counsel on

(continued…)

Defendants alert the Court of the issue, but the matter was actually discussed at the August 8, 2013 CMC. Therefore, not only has this issue been previously identified to the Court, it has been addressed by the Court as well.

Second, Plaintiffs falsely state that Defendants alerted them to Ms. Sullivan's unproduced documents "just 10 days before her deposition on August 22." Mot. at 18. As Exhibit II demonstrates, not only did Defendants initially inform Plaintiffs by phone of the notes, but they also notified both the Court and Plaintiffs in writing on August 1, 2013. At the same time, they produced the documents to Plaintiffs—almost a month before Ms. Sullivan's deposition and only 7 days after Defendants learned of the notebooks' existence. *See* Production Cover Email, Exh. JJ.

Thus, far from being sanctionable conduct, the production of Ms. Sullivan's documents actually demonstrates Defendants' commitment to following CMO 37, which makes provision for exactly this situation. As soon as Defendants discovered the unintentionally unproduced documents, they followed the Court's order (1) by promptly informing both the Court and Plaintiffs of the material and (2) by providing an explanation for the delayed production. *See* CMO 37.

## IV.    Many of Plaintiffs' Complaints are Unfounded and Unfair

Defendants acknowledge that there have been shortcomings in their document production; as discussed above, Defendants have worked diligently to correct them. Plaintiffs' motion goes well beyond these matters, however, asserting discovery deficiencies that at most are minor and at worst untrue. These assertions do not merit the imposition of any relief.

### A.    The Amsterdam Deposition Documents (Allegation H)

Plaintiffs' complaint about BII's production of organization charts a day before the 30(b)(6) deposition of Clare Burrows is misleading and unfair. *See* Mot. at 10. Plaintiffs concede that the volume of the documents concerned was small -- ***four pages*** -- and do not suggest that they were unable to review them before the deposition or that Plaintiffs' examination was prejudiced in any way. Rather, Plaintiffs complain only that they were unable to print the four pages and that "shockingly, copies were not provided by BI until the morning of the deposition when everyone arrived at the deposition." Mot. at 10. Plaintiffs fail to inform the Court that this "shocking" conduct was specifically requested by Plaintiffs' counsel. An hour after receiving the documents by email, the Plaintiffs' attorney taking the deposition, Seth Katz, sent two emails in response. The first requested that Defense counsel "have multiple copies of these documents *at the deposition tomorrow*" and the second stated "please have at least 2 color copies of each documents [sic] *at the deposition*." *See* First May 2 Email from S. Katz, Exh.

---

July 24, 2013 that she inadvertently forgot to provide three notebooks that include handwritten notes on Pradaxa. The next day, the company collected the notes and provided those documents to the vendor. These documents have now been produced.

Exh. II at 2 n.1.

KK; Second May 2 Email From Katz, Exh. LL.  Defense counsel promptly agreed to provide color copies at the deposition as requested.  *See* May 2 Email from S. Duraiswamy, Exh. MM.  At no point did Mr. Katz indicate that he was unable to print the documents or request hand delivery of hard copies prior to the deposition.  He registered no concern on the morning of the deposition when he received the hard copies, and he fully examined Ms. Burrows about the documents.  *See* Burrows Dep. Tr. at 32:9 - 34:5, 43:9-23, 79:20-22, 91:3 - 92:6, 119:23 - 129:16, Exh. NN.

Also absent from Plaintiffs' brief is the acknowledgement that three of the four pages had already been produced to Plaintiffs in November 2012, and the fourth page did not even exist until April 26, 2013 , 7 days before the deposition.  *See* BIPI-PRA-0002044013 (produced Nov. 30, 2012); BIPI-PRA-0002086795 (produced Nov. 30, 2012); BIPI-PRA-0020649134 (created April 26, 2013).

### B.     Notice with Respect to Dr. Friedman's Retirement and the Retirement Documents (Allegations K and Z)

Plaintiffs attempt to convert Defendants' efforts to work cooperatively with Plaintiffs into a violation, accusing Defendants of  "Fail[ing] to Disclose Dr. Jeffrey Friedman's Retiring."  Mem. at 13.  This attempt is devoid of merit.

When Dr. Friedman's deposition was postponed in early June, Defense counsel asked Plaintiffs' counsel that the deposition be rescheduled to occur, per Dr. Friedman's request, before the end of July, when he was set to retire.  While there is no basis for claiming that Defendants have an obligation to update Plaintiffs day-by-day on the future retirement plans of witnesses, there was nothing "subtl[e]" about Defendants' disclosure of Dr. Friedman's retirement: Defense counsel plainly informed Plaintiffs' counsel about this fact and asked Plaintiffs' counsel for the professional courtesy of accommodating the witness' request.  Mot. at 13.  When Plaintiffs' counsel declined to offer this witness the requested courtesy -- even though they then had Dr. Friedman's supplemental documents and had a further month-and-a-half to prepare for his deposition -- Defense counsel instead accommodated Plaintiffs' request for a later date.

Plaintiffs' characterization of Defendants' production of documents is also misleading.  Defendants produced the required portions of Dr. Friedman's personnel file on Friday September 6, 2013 at 9:40 a.m. EST, six days in advance of his deposition (because the fifth day as called for by the CMO 30 was a Saturday).  *See* Sept. 6 Email to R. Denton, Exh. OO.  While portions of Dr. Friedman's personnel file produced to Plaintiffs reference his retirement, the complete file reviewed by counsel did not contain any administrative documentation surrounding his retirement.  As a result, no such documentation was produced along with the personnel file.

That Friday afternoon, Plaintiffs made the following *new* request:  "In addition please beadvised and please accept this email as a formal demand for all materials, documents, memorandums, and/or communications surrounding Dr. Friedman's retirement from BIPI."  *See* Sept. 6 Email Exchange at 3-4, Exh. PP.  These materials were not otherwise responsive to Plaintiffs' document requests or required by CMO 30, which requires only production of "portions of [the witnesses'] personnel file[s] reflecting compensation and/or bonuses and all performance reviews related to Pradaxa."  Nevertheless, Defendants called Plaintiffs' counsel to

discuss what precisely was now being requested to see whether -- in the spirit of cooperation -- there might be information that could be obtained and feasibly produced.

During that telephone conference, which took place late in the afternoon on Friday, Defense counsel agreed to investigate what documents concerning Dr. Friedman's retirement might exist outside of his personnel file and report back on Monday when the relevant administrative staff were back in the office. Defense counsel indicated, in the spirit of full disclosure, that Dr. Friedman had entered into a consulting agreement allowing him to continue some ongoing work with the Company regarding certain new regulatory applications for Pradaxa. Defense counsel also indicated that the agreement was updated that week to expand the scope of work to include Dr. Friedman's assistance of counsel in the current litigation. Although not part of his personnel file, Defense counsel nevertheless provided a copy of the updated addendum to the agreement that he had in his possession, within the five-day period for production of personnel file information, and agreed to obtain the original agreement and provide it Monday morning. *See* Sept. 6 Email Exchange, Exh. PP.

On Monday morning, as promised, Defense counsel provided the original consulting agreement, along with the fully executed Addendum, which Dr. Friedman had provided that morning, and also reported that BIPI staff was working to collect any available materials in response to Plaintiffs' Friday afternoon request for documents surrounding Dr. Friedman's retirement. *See* Sept. 9 Email from M. Imbroscio, Exh. QQ. BIPI collected, reviewed for privilege, redacted, and produced an additional 56 pages of documents related to Dr. Friedman's retirement on Tuesday September 10 at 5:42 p.m. EST. *See* Sept. 10 Email from N. Hailey, Exh. RR.

None of these retirement documents were part of Dr. Friedman's personnel file. Instead, they were miscellaneous, administrative communications that would not otherwise be responsive to Plaintiffs' document requests or this Court's orders. Moreover, Plaintiffs had known about Dr. Friedman's retirement since June, as Defendants had disclosed this information to Plaintiffs in advance of Dr. Friedman's retirement, but did not request these documents before the Friday afternoon prior to his deposition. Now, Plaintiffs have attempted to portray this episode not as it was -- professional lawyers working responsively to satisfy a new request in the spirit of cooperation -- but instead as an alleged example of non-compliance.

In the end, Plaintiffs used only 9 of the allocated 14 hours for Dr. Friedman's deposition, demonstrating that the issues of which they complained did not prevent the deposition from proceeding quickly and smoothly.

### C. Certification Issues (Allegation L)

Plaintiffs accuse Defendants of two violations of this Court's certification requirements from CMO 37. Both are unjustified.[18] Plaintiffs first allege that the deLannoy and Friedman

---

[18] Defendants have attached copies of each BIPI BII certification, as well as each letter notifying Plaintiffs and the Court of supplemental documents to illustrate the thoroughness of Defendants' (continued…)

certifications were incorrect because Mr. deLannoy's personal day planners were later discovered and produced and because Dr. Friedman's personal retirement emails were later produced in response to Plaintiffs' specific request for them. This allegation lacks merit. As to Mr. deLannoy's day planners, those were only discovered the day before his deposition despite previous inquiries by counsel regarding Mr. deLannoy's documents. *See* deLannoy Dec., Exh. J. When they were discovered, they were promptly disclosed and produced in accordance with CMO 37. Dr. Friedman's retirement emails were not called for through discovery requests but were nevertheless promptly produced upon request. Neither instance is inconsistent with counsel's affirmation that "all of the responsive documents" have been produced based upon "a reasonable inquiry." *See* CMO 37.

The second allegation arises from the fact that, while Defense counsel was on vacation with his children in Canada, he was unable to notarize certifications that were due during that time period. He thus instead signed the certifications as an officer of the Court to avoid delay in producing documents, and he removed the notary line that could not be signed. Counsel had absolutely no intention to flout a court order and provided substitute certifications when the PSC asked for them.

The PSC alleges that the removal of the notary line was deceptive, but the fact that the certifications were not notarized was obvious from the face of the document.[19] Moreover, Defense counsel has since worked with the PSC to provide advance notice of instances where he will not be able to contemporaneously notarize certifications. (For example, Defense counsel has traveled to Germany several times when certifications are due, to prepare witnesses for depositions in this matter.) Thus, there is no prejudice or bad faith in this episode. Instead, it is entirely improper for Plaintiff's counsel to threaten to raise the issue with the Court unless Defense counsel met their demands, and then, after Defense counsel met their demands, nevertheless present the issue to the Court, accompanied by false allegations of "deception." *See* Aug. 16 Emails from S. Katz, Exh. SS.

### D.  AER Source Files (Allegation M)

Although BIPI and BII produced a virtual machine that contains a functioning replica of its internal pharmacovigilance database (the ARIS-g system), Plaintiffs requested the production of hard copy source-files that related to certain adverse events. After a meet and confer that took

---

compliance with the certification requirements. *See* BIPI Certifications, Exh. TT; BII Certifications, Exh. R.

[19] In fact, if the PSC's standards were applied to both sides, then the PSC has also violated this Court's orders. The PSC, for example, has cancelled depositions without complying with CMO 8's requirement that they "notify opposing counsel in writing *with the reason for the need to do so*." CMO 8 at 13 (emphasis added). After Defendants twice requested the reason for one of these cancellations, Plaintiffs' counsel identified a Plaintiff lawyer conflict in another litigation (ironically, deposing one of the Japanese witnesses that Plaintiffs later in their brief seek to use against Defendants) before demanding "Good enough reason?" *See* Aug. 23 Email from M. London, Exh. S. Defendants accepted this explanation and rescheduled the deposition at a time convenient for Plaintiffs.

place over several months and in which source files were originally requested from numerous countries across the world, BIPI and Plaintiffs reached an agreement under which a specific category of U.S. source files for certain adverse events would be produced in January of 2013. This collection consisted of over 5,000 individual files related to specific adverse events, and because of the Plaintiffs' insistence that these were some of the most important materials in the litigation, BIPI agreed to produce them on a rolling basis and made two productions on January 15, 2013 and January 25, 2013.

After making these productions, BIPI heard nothing more about them and continued its other document production work. Then, in July 2013 -- six months after the production and despite Plaintiffs' repeated insistence in November and December 2012 that they needed the files on an expedited basis -- Plaintiffs for the first time reported that they were reviewing the materials and were having difficulty corresponding certain materials to file folders. Counsel for BIPI responded to Plaintiffs' questions promptly and, within three weeks, provided several overlays that corrected the mechanical discrepancy with the production as well as identifying attachment ranges in the documents. The discrepancy resulted from BIPI's hurried efforts in December and January to meet the demands of the Plaintiffs to produce the materials quickly and on a rolling basis in two productions. During this process BIPI also identified 101 file folders of the several thousand produced that were inadvertently not collected, and it immediately obtained those and produced them. These issues were promptly rectified and are indicative of nothing more than an effort to produce numerous paper folders on an expedited basis.

### E. WebBI (Allegation R)

WebBI[20] refers to the global company intranet. It is the home page BIPI employees see when they click their internet browser. WebBI is not a database. Nor is it a document repository. WebBI merely displays content that is stored in other locations. For example, documents stored in Idea for Submission (Idea for Sub), Idea for General Business (Idea for Gen), and Idea for Controlled Documents (Idea for Con) can be linked to WebBI so that employees can easily access them. Defendants have already produced responsive documents from Idea for Sub, Idea for Gen and Idea for Con.

It therefore is not surprising that WebBI was not identified in the 30(b)(6) relating to databases, storage locations, and other discovery requests. And Defendants could not have been expected to volunteer the information in a deposition (or indeed in the discovery process as a whole) in which it would have been a non-sequitur.

Defendants have worked cooperatively regarding WebBI. Defendants have responded promptly to Plaintiffs' questions about the intranet, and it is unclear from Plaintiffs' argument what, if any, open issues remain.

---

[20] "MyBI" is the name of the current company intranet. It went live at certain BI companies including BIPI in August 2009. So as not to confuse the response to Plaintiffs' allegations concerning both, Defendants will refer to the company intranet as WebBI.

In complaining about WebBI, Plaintiffs also mention some general sales training materials Ms. Sullivan referred to in her deposition. Defendants have already agreed to produce these and other "general" documents identified by Plaintiffs post-deposition even though the documents are not Pradaxa-specific, so this issue is moot as well.

### F. Identifying and Producing Lync (Allegation S)

Lync is BI's current unified messaging platform. Lync handles instant messages, on-line meetings, and voicemails. The program is used as an alternative to phone conversations or live discussions and thus it has been configured so that online conversations and meetings (like their live equivalents) are not recorded. Once a conversation is over and the message screen is closed, there is no record. Further, employees are not permitted to use Lync for official company communications.

As such, Lync is neither a database nor a document repository. As with WebBI, there was simply no reason for Defendants to spontaneously identify Lync in the 30(b)(6) deposition relating to databases, storage locations, and other discovery requests.

### G. Migrating One Database to Another Without Notifying the PSC (Allegation U)

There is no dispute that the Vista and Bold databases have been largely replaced by Veeva. As noted by both parties, beginning July 1, 2013, Vista went off-line and sales representatives and CSCs began inputting information into Veeva. Bold went off line on May 3, 2013. MSL interactions between May 3 and June 17, 2013 were maintained in an excel spread sheet while Veeva was being rolled out. This data was subsequently input into Veeva. Today, sales representatives, CSCs, and MSLs all input their data into Veeva.

There is no allegation that Defendants failed to preserve either Vista or Bold or that there was anything inappropriate in the manner in which the databases went off-line and were replaced by Veeva. Nor is there any allegation that Defendants failed to preserve Vista or Bold, or that Defendants missed any deadline for the Veeva (formerly Vista) update. The next update is due October 1.

Plaintiffs' only concrete allegation is instead that Defendants did not immediately tell them about the migration. But Defendants have no obligation to notify Plaintiffs immediately whenever some internal change occurs with a database, so long as Defendants maintain the relevant data. In any event, Defendants disclosed the existence of Veeva on August 8 -- almost two months prior to the next scheduled update, and the fact that they did not disclose earlier does not reflect any lack of transparency or good faith. In addition, Defendants produced the Bold side of Veeva on August 30 without incident. Plaintiffs have been provided with some samples from Veeva, and the parties continue to meet and confer on future productions.

### H. Hashad File (Allegation V)

Plaintiffs allege that Defendants are unwilling to provide Wa'el Hashad's custodial file. *See* Mot. at 24. Plaintiffs' allegation is a much shorter version of the claims they made in the motion to compel the production of Mr. Hashad's custodial documents, filed just last week.

Before the motion was filed, Defendants repeatedly explained to Plaintiffs that while they have produced thousands of emails sent to and from Mr. Hashad, as well as thousands of documents otherwise referencing him, they do not have his custodial documents because he left BIPI in August of 2011. His custodial files were then deleted according to Defendants' document production protocol, months before there was any indication that this litigation was imminent. As Defendants have explained at greater length in their response to the motion to compel, they were under no duty to preserve files at the point they were deleted. See *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681-682 (7th Cir. 2008) (no duty to preserve unless party knows or should know that litigation is "imminent"). Thus, those files are not a basis for sanctions.

## I.  "Date-Created" Meta-Data Field Differs from the Date on the Face of the Document" (Allegation X)

The "meta-data" issue referenced by Plaintiffs is not a discovery abuse but rather is a function of technology and how custodians handle their email. Defendants' e-discovery counsel, LeClairRyan, has already explained why there may be scenarios in which the date-created meta-data field differs from the date on the face of the document. Days before the September CMC, LeClair offered to continue the discussion with the PSC, and received no response. See Aug. 30 Email to S. Katz, Exh. T. Meta-data issues were neither identified by Plaintiffs on the agenda, raised during the in-chambers discussion, or raised on the record. Nor should they have been, as this is a technical issue that Plaintiffs' vendor should be able to explain to counsel.

Plaintiffs first raised the question about why the meta-data "create date" did not match the date as it appears on the face of certain email several weeks ago. LeClair reviewed the samples Plaintiffs provided and promptly explained that the scenario presented was the result of how the custodian managed and stored certain email. Specifically, emails kept within the Microsoft Exchange Server do not have a create date. Emails have "sent" and "received" dates. Only files have create dates, and emails are not files within Microsoft Exchange. When an email is moved outside of Microsoft Exchange, it becomes a "file" and receives a "create" date. When a custodian moves an email from Microsoft Exchange to another location (for example, a pst archive), it will receive a "create" date of the day it was moved. The "sent" and "received" dates remain unchanged, and create a situation where the meta-data create field differs from the date on the face of the document.

## J.  "Other Difficult Matters" (Allegation AA)

Plaintiffs also include a series of "other difficult matters" that by their own admission are not "discovery abuses or non-compliance with Court Orders." Mem. at 26. In fact, two of the five "other difficult matters" involve Defendants following Court orders that were specifically negotiated between parties but that Plaintiffs no longer like. None of the five "other difficult matters" is fair or remotely meriting of sanctions.

### 1.  BIPI Depositions in Danbury, Connecticut

Plaintiffs state that "BIPI has steadfastly insisted that all corporate witness depositions occur in Danbury, Connecticut." Mot. at 27. Yet, in choosing this location -- a hotel that is located less than a mile from BIPI's campus -- Defendants have followed precisely the directive

that the Court set forth in CMO 8 requiring that depositions generally occur at the place convenient to the witness: "To the extent reasonably possible, *depositions of witnesses located in the United States will take place in the deponent's home district* or, *if counsel for the deponent agrees*, in another district convenient to the deponent, counsel and the parties. *The location of the deposition shall be as consistent as possible* within each city so that videotape equipment, if being used, can be left in place." CMO 8 at 4-5 (emphases added).

Defendants have simply exercised their rights to accommodate their witnesses pursuant to a Court Order.[21] Plaintiffs seek a double-standard under which they are allowed to accuse Defendants of improperly seeking reconsideration any time Defendants seek modification of a CMO provision, but when Defendants adhere to a CMO provision that Plaintiffs dislike, that adherence to a Court Order can be the basis for an obstruction charge in a sanctions motion.

### 2.     BII Depositions in Amsterdam

Plaintiffs' criticism of BII depositions occurring in Amsterdam is even more explicitly contrary to this Court's orders. CMO 13 states quite clearly: "To the extent reasonably possible, depositions of witnesses located outside the United States will take place at a mutually agreeable location *in Amsterdam* or London, and current or former employees of BII and/or the Dismissed Foreign Defendants shall be able to select same." CMO 13 at 4 (emphasis added). This provision was the result of extensive negotiations between the parties, in which -- among other things -- German defendants agreed to forgo a Hague Convention right to have all German witnesses deposed in that country.

### 3.     Weekend Depositions

Defendants scheduled the first round of BII depositions on the days requested by Plaintiffs. In scheduling these depositions, Defendants notified Plaintiffs that the two witnesses whose native language was German would testify in German, as allowed by CMO 13, and the two witnesses whose native language was English would testify in English. *See* CMO 13 at 13. When the witnesses elected to testify in German, as permitted by CMO 13, Plaintiffs complained about not being able to complete the four depositions in two weeks. Defendants proposed having the depositions occur simultaneously with different attorneys from the Plaintiff and Defense teams handling the depositions. Plaintiffs declined this proposal. They instead proposed conducting the depositions on weekends, which the witnesses did not want to do given that they were already traveling from home for the depositions and because one of the witnesses had already agreed to be deposed on an important German national holiday (Unity Day). The parties instead reached an accommodation by adding time to each deposition day and avoiding weekend depositions. It is unfair for Plaintiffs to now complain about this agreement.[22]

---

[21] Since Judge Stack has become involved in the litigation, he, too, has requested that depositions occur in another location. In an effort to accommodate the Special Master, Defendants have begun conferring with Plaintiffs on potential alternate locations.

[22] Similarly unfounded are Plaintiffs' allegations in footnotes 31 and 32. Footnote 31 falsely states that former BIPI employee Anna Moses requested a weekend deposition -- she did not. (continued…)

### 4. Judge Stack

It is unclear what importance Plaintiffs ascribe to the fact that Defendants initially opposed the cost of a Special Master for every deposition, but later advocated for a broader role for Judge Stack once he was appointed, though they appear to suggest that Defendants will use Judge Stack to delay discovery. Such an argument is completely unfounded, for the simple reason that Defendants immediately agreed that any dispute brought to Judge Stack could be presented to the Court if not resolved within 3 days. In addition, the Court agreed that expansion of Judge Stack's role made sense in light of the repeated issues between the parties.

### 5. PHRI

Defendants have been in touch with counsel for PHRI, and have made diligent efforts to assist the PSC in obtaining documents from PHRI. But Defendants have no means to control PHRI's actions. As Plaintiffs' know, PHRI have separate counsel and Defendants cannot simply snap their fingers and command that PHRI immediately produce the documents Plaintiffs seek.

### ARGUMENT

Plaintiffs ask the Court to accept their range of complaints as a basis for excusing Plaintiffs from proving their cases -- the sole remedy they specify in their motion is entry of default judgment in well over 1000 cases. That remedy is simply inappropriate. The facts do not support that remedy for the reasons discussed above, and, as discussed below, the law does not support it either.

### I. There is no legal basis for entering default judgment against Defendants.

In general, a court may issue a sanction only where "a reasonable jurist, apprised of all the circumstances, would have chosen [the sanction] as proportionate to the infraction." *Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 740 (7th Cir.1998). In assessing the proportionality of the sanction, courts consider both the nature of the harm and the extent of the prejudice to the opposing party. *See Wallace v. McGlothan*, 606 F.3d 410, 427-428 (7th Cir. 2010) (citing absence of prejudice in refusing to find discovery violations merited dismissal of case).

Ordering a default judgment is "an extreme sanction," typically only permitted in cases of "flagrant bad faith" or the "callous disregard" of responsibilities." *National Hockey League v.*

---

Instead, when she asked to avoid any deposition, due to current work she cited with another employer, BIPI counsel reached out to Plaintiff's counsel to see if they really intended to depose her, given that they had previously announced an intent to depose her and then withdrawn their request. Plaintiff's counsel responded by proposing a weekend deposition, which BIPI worked with Ms. Moses to accommodate. *See* Aug. 29 Email from Michael London, Exh. XX. Thus, the situation is exactly the opposite to what Plaintiffs claim.

With respect to footnote 32, BII simply asked to switch the ordering of two witnesses when one witness informed counsel for BII that he had a court-ordered adoption hearing at the time his deposition was set. There is no conceivable unreasonableness in such a request.

*Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643 (1976). It is warranted only when "the party against whom sanctions are to be imposed totally failed to comply" with a court's discovery order. *Fox v. C.I.R*, 718 F.2d 251, 255 (7th Cir. 1983); *see also In re Thomas Consolidated Ind., Inc.*, 456 F.3d 719, 725 (7th Cir. 2006) (discussing *Fox* and upholding dismissal only after finding party's discovery responses could "rightly be treated as total failure to answer"). Further, the Supreme Court has held that "serious constitutional questions" compel the conclusion that dismissal may not be imposed as a discovery sanction absent a showing of willfulness, bad faith, or fault. *Societe Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 212 (1958). The Seventh Circuit has explained that "fault," in this context, "is not a catch-all for any minor blunder that a litigant or his counsel might make." *Long v. Steepro*, 213 F.3d 983, 986-88 (7th Cir. 2000). Instead, fault "suggests objectively unreasonable behavior; it does not include conduct that we would classify as a mere mistake or slight error in judgment." *id.*

There is no basis in the law for using the discovery difficulties that Plaintiffs cite, whether taken together or in isolation, as a justification for "the extreme sanction" of default judgment. Given the scope of Defendants' discovery efforts to date, it simply cannot be said that they have "totally failed to comply" with the discovery orders of this Court. *Fox*, 718 F.2d at 255. Rather, in complying with those discovery orders, Defendants have spent more than 24 million dollars producing over 27 million pages of material and many additional databases with over 500 gigabytes of data.

Plaintiffs also cannot demonstrate the "willfullness, bad faith, or fault" required to justify entry of default judgment. Defendants concede that there have been problems in their productions, but Defendants have approached this litigation and the discovery process in particular with substantial efforts and in complete good faith. Plaintiffs have not and cannot offer any conclusive evidence that the discovery difficulties have been the result of "willfulness" or "bad faith," let alone the "clear and convincing" evidence the Seventh Circuit requires. *See Maynard v. Nygren,* 372 F.3d 890, 892 (7th Cir.2004).

Nor is it possible to deem Defendants' document production efforts "objectively unreasonable," as is necessary for a finding of fault. *Long*, 213 F.3d at 986. Defendants have consistently strived to work with Plaintiffs to get them the material they want, in the formats they seek, and on the compressed schedule they have requested.[23] Defendants' efforts have not been completely successful in every instance. But such difficulties in production in the context of a litigation effort that is consuming tens of millions of dollars and many thousands of person-hours--and where Defendants are making substantial efforts to cure the specific problems that have arisen--do not warrant the "draconian sanction" of default judgment. *Id; see also Marshall*

---

[23] Examples of such cooperation include assisting Plaintiffs in the use of the ARISg production when their IT vendor did not fully understand the export; bates stamping, at Plaintiffs' request, documents produced natively on the Z Drive (even though Plaintiffs had insisted that the drive be produced in this format), and providing Plaintiffs with the exact locations of more than 300 adjudication reports on the Z Drive and Idea for Sub that Plaintiffs wrongly accused Defendants of withholding from production.

*v. JP Morgan Chase Bank*, No. 3:11-CV-332, 2013 WL 2403241 (N.D. Ill. May 31, 2013) (denying discovery sanction of dismissal and citing *Cont'l Ins. Co.*, 59 F.App'x 830, 843 (7th Cir. 2003), a case in which the Seventh Circuit explicitly rejected the propriety of such a sanction in a "document intensive" case involving a "short discovery time frame established by the district court," observing that "[w]hile in the end there may have been some deficiencies in [the party's] responses, most were minor, or were rectified through supplemental responses"); *cf. Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1421 (Fed. Cir. 1997) (reversing ALJ's decision to dismiss an ITC case for a document based violation where party "assert[ed] without contradiction that during the course of the ITC proceeding it answered over 600 discovery requests, produced twenty-four witnesses for deposition, reviewed over three million pages of documents, identified and produced over 800,000 documents, and defended nine summary judgment motions").

Further, imposing a default judgment on Defendants would be in severe tension with the law's general emphasis on reasonable, good faith efforts -- rather than perfection -- in the discovery process. This emphasis is demonstrated in at least two ways. First, Federal Rule of Civil Procedure 26(g) requires attorneys to sign discovery responses, affirming that they are "engag[ing] in pretrial discovery in a responsible manner." *See* Fed R. Civ. P. 26 Committee's Notes (amended 1983). The Committee's Notes to the Rule, however, make clear that the duty is fulfilled when counsel had "made a *reasonable* effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." *Id.* (emphasis added). Applying this standard in the context of large scale e-discovery cases, a federal judge has recently explained that the Federal Rules do not require that each document production be "complete," but only that parties make reasonable efforts and supplement productions "in a timely manner if the party learns that in some material respect [it] is incomplete." *See DaSilva Moore v. Publicis Groupe & MSL Group*, 287 F.R.D. 182, 188 (S.D.N.Y. 2012).

Second, even if a court does find that a party has transgressed the rules of discovery, sanctions may be imposed only where they are proportional to "the gravity of the misconduct, the prejudice if any to the defendant," and the merits of the case. *See Bolt v. Loy*, 227 F.3d 854, 856-57 (7th Cir. 2000). As Defendants have explained, they have made a mistake with respect to their initial document collection efforts (not intentionally withheld or destroyed documents), but many of the problems that resulted from that mistake have already been remedied, and the remaining difficulties are currently being addressed quickly. Moreover, because of Defendants' remedial efforts, Plaintiffs' ability to fully present the merits of their case has not ultimately been affected. There have been delays, the effects of which Defendants have already taken steps to ameliorate, but Plaintiffs have not been lastingly deprived of responsive documents. *See id.* (citing absence of prejudice as a reason to deny dismissal as a discovery sanction). And it is beyond question that the merits of this case are such that BII's and BIPI's defense cannot otherwise be summarily dismissed. *Id.* (suggesting that obviously frivolous cases are prime candidates for the sanction of dismissal). Given the nature of the harm, the absence of prejudice to Plaintiffs' merits case, and the substantive nature of the defense, the sanction of default judgment is obviously disproportionate. *See, e.g.*, *In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979*, 90 F.R.D. 613, 620-22 (N.D. Ill. 1981) (declining to impose even an adverse inference instruction where party had *destroyed* a key report in extremely suspicious

circumstances, because the report's destruction merely delayed the parties ability to obtain the relevant information).

Unsurprisingly, the cases Plaintiffs cite also do not support entrance of a default judgment. Most notably, Plaintiffs include a lengthy cite to *Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 191 (7th Cir. 2011), explaining that the case is particularly "useful" because it is "recent." *Brown* is, in fact, a recent Seventh Circuit case granting dismissal of a party's claims as a sanction, but the case actually demonstrates that the sort of behavior that typically merits such a severe sanction does not exist in this case. The Plaintiffs in *Brown* did not file **any** response to discovery requests, interrogatories, or requests for admission, missing **five** deadlines for such responses. The final two deadlines were imposed through an order granting a motion to compel, and an order granting a motion for lesser sanctions. After Plaintiffs missed the fifth and final deadlines, Defendants filed for the sanction of dismissal. "During oral arguments for that motion, plaintiff-counsel acknowledged that he had only communicated with roughly 75 to 100 of the plaintiffs, which led the district court to conclude that the majority of the plaintiffs may not have even been aware that the suit had been filed on their behalf." *Brown* , 664 F.3d at 185 (7th Cir. 2011). It is hard to imagine what similarities Plaintiffs thought could be drawn between *Brown* and the case at hand.

The other cases Plaintiffs cite involve equally dramatic facts that have no applicability here. For example, *Wellness International Network, Ltd. v. Sharif*, 2013 WL 4441926 involved a litigant who "refus[ed] to produce requested documents for five years" and then produced a mere "1,500 pages of documents" at the eleventh hour. Defendants' discovery difficulties do not even belong in the same ballpark as those exhibited in the cited cases. It is very clear, therefore, that entering default judgment could not be considered "reasonable under the circumstances." *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011).

## II.    Lesser Sanctions are similarly inappropriate.

Appellate courts have reversed even the award of lesser sanctions in cases analogous to and far worse than this one. In *Bonds v. Dist. of Columbia*, the D.C. Circuit reversed a broad preclusion order that had been instituted as a discovery sanction against a party that had produced over 2.5 million documents. The Court held that "to be punitive without regard to the substantial discovery that had occurred and was continuing, particularly given the district court's acknowledgment of other litigation burdens, would run afoul of the proportionality requirement and be overly harsh, and thus, unreasonable." 93 F.3d 801, 813 (D.C. Cir. 1996) ; *see also Second Chance Body Armor, Inc. v. Am. Body Armor, Inc.*, 177 F.R.D. 633, 634-37 (N.D. Ill. 1998) (refusing to strike a party's affirmative defenses, even though the party "failed to comply with [the judge's] order to "informally exchange discovery" for a period of two and a half years, because the sanction was disproportionate).

The Third Circuit has also recently reversed a district court's award of monetary sanctions against Defendants in a class action where the discovery period continued for five years. *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 127 (3d Cir. 2009). After a sanctions hearing, the judge found numerous deficiencies in Defendants' discovery efforts over that time. For example, he found that the Defendants made a series of unfounded objections to producing documents. He also found:

numerous instances of . . .last minute or late document production,
including the following: [l]ate in the evening after normal business
hours the night prior to [depositions related to claims data],
counsel for Keystone forwarded hundreds of documents which
previously had been requested by plaintiffs," (2) [t]ens of
thousands of documents were produced by defendants collectively
. .. . . the day before the end of class discovery, (3) on "the last day
of class discovery, Capital produced [certain] documents after
repeatedly denying that it had any such documents, App. at 85; and
(4) after the deadline for class discovery production had passed,
Highmark produced 4,356 pages of documents, some of which had
been previously produced by Highmark to defendants' joint expert,
and included [certain documents], of which Highmark and its
counsel previously had denied possession.

*Id.* at 135. Despite such findings, the Third Circuit held that the district court's order granting monetary sanctions against Defendants could not be sustained because the court had not properly analyzed whether Defendants' discovery deficiencies were "substantially justified" by the circumstances. *Id.* at 140. The Third Circuit observed that Federal Rule of Civil Procedure 26(g), under which the lower court had issued its sanctions, only permits the penalization of discovery deficiencies that occur without "substantial justification." It therefore reversed so that the lower court could consider whether Defendants may have been justified in some of their actions.

Both *Bonds* and *Grider* suggest that when confronted with document intensive cases that -- in and of themselves -- impose substantial burdens on a producing party, courts should be loath to add to those burdens by penalizing conduct that may be understandable in the circumstances. This is particularly the case here where Defendants have already imposed upon themselves substantial additional burdens, in the form of their re-check process and other steps, designed to ensure that discovery in the future proceeds more smoothly. As one district court recently put it: "Defendants did make a mistake, but they did remedy that mistake and have now disclosed everything Plaintiff requested." *Citizens Ins. Co. of the Midwest v. LG Electronics, USA, Inc.*, 3:11-CV-40-RLY-WGH, 2012 WL 3614044 (S.D. Ind. Aug. 21, 2012) (refusing to impose any sanctions where an administrative error led Defendants to produce far fewer responsive documents than were ultimately located).

Defendants in this case did make mistakes, but they are working to remedy those mistakes, at great cost and quickly. In the meantime, Plaintiffs have already received more than 27 million pages of responsive documents, and more are being prepared for production every day. In these circumstances, "to be punitive without regard to the substantial discovery that has occurred and [is] continuing, . . . would run afoul of the proportionality requirement" that guides

the imposition of any discovery sanction.  *See Bonds*, 93 F. 3d at 813; *Salgado*, 150 F.3d at 740.[24]

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that Plaintiffs' Motion should be denied.

Respectfully submitted,

*/s/ Paul W. Schmidt*

Paul W. Schmidt (DC # 472486)
Michael X. Imbroscio (DC # 445474)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: (202) 662-6000
Fax: (202) 662-6291
pschmidt@cov.com
mimbroscio@cov.com

Dan H. Ball (# 6192613)
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, MO 63102-2750
Phone:  (314) 259-2000
Fax:  (314) 259-2020
dhball@bryancave.com

---

[24] It is disturbing that, while seeking draconian sanctions from Defendants, Plaintiffs make various statements in their brief that are misleading or simply not true.  *See, e.g.*, Mot. at 9 (falsely alleging that BIPI had violated CMO 8); Mot. at 18 n. 18 (providing incorrect account of events surrounding the Sullivan deposition documents); Mot. at 28 n.31 (misstating facts regarding Moses weekend deposition).  At other times, Plaintiffs have made arguments that go beyond the bounds of responsible advocacy.  *See, e.g.*, Mot. at 27 (accusing Defendants of obstruction for following a court order with respect to deposition locations, without citation to that court order).  Giving Plaintiffs the benefit of the doubt that they declined to extend to Defendants, these misrepresentations are almost certainly unintentional.  Nevertheless, they are disquieting.  *See First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago*, 80 C 6401, 1986 WL 6928 (N.D. Ill. June 10, 1986) (sanctioning party for false statements made in conjunction with his motion to compel).

Eric E. Hudson (TN # 022851)
BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Phone: (901) 680-7200
Fax: (901) 680-7201
eric.hudson@butlersnow.com

*Attorneys for Defendant Boehringer Ingelheim
Pharmaceuticals, Inc.*

Beth Rose (NJ # 028491987)
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Phone: (973) 643-5877
brose@sillscummis.com

*Attorney for Defendant Boehringer Ingelheim International
GmbH*