UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

_____

| | | |
|---|---|---|
| IN RE PRADAXA | ) | MDL No. 2385 |
| (DABIGATRAN ETEXILATE) | ) | 3:12-md-02385-DRH-SCW |
| PRODUCTS LIABILITY | ) | Judge David R. Herndon |
| LITIGATION | ) | |

_____

This Document Relates to:

ALL CASES

CASE MANAGEMENT ORDER NUMBER 53

HERNDON, Chief Judge:

I. INTRODUCTION

This matter is before the Court on Boehringer Ingelheim International GmbH's ("BII") motion for a protective order barring the depositions of Dr. Andreas Barner, the Chairman of the Board of Managing Directors ("BMD") of BII, and Allan Hillgrove, a member of the BMD (Doc. 293). The Plaintiffs' Steering Committee ("PSC") filed a response in opposition (Doc. 307), a supplemental response in opposition (Doc. 337), and memorandum in support thereof (Doc. 338). Thereafter, BII filed a reply in support of its motion (Doc. 344).

According to BII, deposing Dr. Barner and Mr. Hillgrove will place a great burden on the officers themselves and on the corporation as a whole. BII asserts this is particularly true for Dr. Barner, who has ultimate responsibility for oversight of Boehringer Ingelheim's entire global organization. BII notes that both

1

men sit on numerous boards within the corporation and are constantly travelling among Boehringer Ingelheim's various worldwide entities. Accordingly, preparing for and appearing at a deposition will take time away from these corporate responsibilities. Moreover, BII contends, the plaintiffs have deposed and will depose many other employees and executives who possess the same and greater knowledge about the facts underlying this litigation. Thus, BII argues, the information Dr. Barner and Mr. Hillgrove possess can be obtained from some other source that is more convenient, less burdensome, and less expensive.

## II. APPLICABLE LAW

District courts have broad discretion in matters relating to discovery. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 646–47 (7th Cir. 2001); *Rennie v. Dalton*, 3 F.3d 1100, 1110 (7th Cir. 1993). Although there is a strong public policy in favor of disclosure of relevant materials, Rule 26(b)(2) of the Federal Rules of Civil Procedure empowers district courts to limit the scope of discovery if "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C).

A party may move for a protective order, which the court may grant "for good cause ... to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ...." Fed.R.Civ.P. 26(c). The burden is on

the party seeking the protective order to demonstrate that good cause exists for the entry of the order by making a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

There is no *per se* rule prohibiting the depositions of high-ranking corporate executives. However, deposing such witnesses can be "quite costly and burdensome." *Patterson V. Avery Dennison Corp.,* 281 F.3d 676, 682 (7th Cir. 2002). Accordingly, courts recognize that under some circumstances it is appropriate to restrict efforts to depose senior executives. *See Patterson v. Amery Dennison Corp.*, 281 F.3d 676, 681–82 (7th Cir. 2002). Indeed, the undersigned judge has precluded such depositions in the past. *See e.g., In re Yasmin and Yaz,* 2011 WL 3759699 (Aug. 18, 2011) (Herndon, C.J.).

This, however, does not mean that high-ranking corporate executives are immune from depositional discovery. Rather, "[b]efore restricting discovery [under Rule 26], the court should consider "the totality of the circumstances, weighing the value of the material sought against the burden of providing it, and taking into account society's interest in furthering the truthseeking function in the particular case before the court." *Patterson*, 281 F.3d at 681. (internal citation omitted). In conducting this analysis, courts often focus on whether the senior executive possesses unique, specialized, and/or personal knowledge relevant to the litigation. *See e.g., Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 681–82 (7th Cir. 2002)*; Thomas v. IBM,* 48 F.3d 478, 483–84 (10th Cir. 1995); *Lewelling*

*v. Farmers Ins. of Columbus, Inc.*, 879 F.2d 212, 218 (6th Cir.1989); *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979).

### III.  ANALYSIS

#### A.  Dr. Andreas Barner

##### 1.  Background

The plaintiffs seek to depose Dr. Andreas Barner. Dr. Barner is the Chairman of the Board of Managing Directors of BII and is based in Germany (Doc. 293 p. 2). The Board of Managing Directors oversees Boehringer Ingelheim's global organization, which is comprised of BI's global corporate function in Ingelheim, Germany and its affiliates around the world, including Boehringer Ingelheim Pharmaceuticals International, Inc. ("BIPI") (Doc. 293 p. 2). According to BII, as Chairman of the BMD, Dr. Barner serves in a functionally equivalent role to a global CEO, making him the highest ranking officer in the entire organization (Doc. 293 p. 2).

Dr. Barner has been involved in Pradaxa-related issues. For example, Dr. Barner is Chair of the Pradaxa Steering Committee (Doc. 293 p. 3). However, BI contends his involvement has not been as extensive as that of the BI executives and employees whose sole or primary responsibilities are Pradaxa-related. Thus, according to BII, the many other executives and employees that have been and will be deposed in this litigation possess the same and greater knowledge about the facts underlying this litigation, and the plaintiffs will have more than ample

4

opportunity to obtain the information necessary and relevant to this litigation from that group of existing designated witnesses (Doc. 293 p. 3).

The plaintiffs disagree. The plaintiffs contend that Dr. Barner possesses unique, firsthand, non-repetitive knowledge of facts and events central to this litigation that cannot be obtained without his deposition. Specifically, the plaintiffs argue that Dr. Barner was involved in and at times directed Pradaxa-related decisions central to this litigation.

### 2. Notable Evidence

In assessing the parties' arguments, the Court specifically notes the following:

#### a. BII Presents Dr. Barner's as a Unique "Hands-On" Executive

In BII's marketing material, it holds Dr. Barner out as a uniquely "hands-on" chief executive who, unlike other executives, is the head of research and development and plays a primary role in drug development. Specifically, the plaintiffs point to the following excerpt from a BII media clip:

> Boehringer's chairman is Professor Andreas Barner who is also highly unusual among pharma leaders - while most chief executives were trained in law, finance or marketing, Barner has a research science background. Even more exceptional is that Barner is also head of R&D operations, and maintains a hands-on role in drug development.

(Doc. 307-11 p. 10).

### b. Involvement with the IDC, BMD and Pradaxa Steering Committee

The International Development Committee ("IDC") is a BII Committee that directed many of the important scientific decisions related to the development, testing and safety of Pradaxa (Doc. 338) (discussing testimony of Dr. Klaus Dugi). For example, according to testimony provided by the plaintiffs, the IDC is generally responsible for approving new projects (including authorizing the expenditure of funds – based on a "rough estimate of the costs" and the use of personnel) (Doc. 337 pp. 2-3). With respect to Pradaxa, the IDC authorized the release of funds for the development of Pradaxa (Doc. 337 pp. 2-5). However, there is evidence that – at least between 2003 and 2009 – the IDC did not approve funds for the development of a reversal agent for Pradaxa (Doc. 337 pp. 2-5).

Dr. Barner chaired the IDC (Doc. 337 pp. 2-5). With regard to critical issues such as the decision to seek approval for Pradaxa prior to the development of a reversal agent and without a protocol for monitoring its therapeutic level, the deposition testimony indicates that these decisions were made by the IDC and that Dr. Barner may have been involved with the decisional process and/or endorsed the decisions (Doc. 337 pp. 2-5);

Dr. Barner is also the Chair of the Pradaxa Steering Committee and, as noted above, the BMD (Doc. 293 p. 3; Doc. 307 p. 7; Doc. 338 p. 2). The material presented by the PSC indicates that as Chair of the Pradaxa Steering Committee and of the BMD, Dr. Barner was involved in Pradaxa-related decision making (*See*

*e.g.,* Doc. 307 pp. 7-8 and the exhibits cited therein) (referencing involvement in the RE-LY audit report, responding to the FDA's concerns about its ability to perform a reasonable review of RE-LY, and the internal audit of the RE-LY study)

### c. Dr. Klaus Dugi's Deposition Testimony Regarding Monitoring Protocol

Dr. Dugi testified that in May 2012 he prepared an email and forwarded a one-page summary and PowerPoint presentation to Dr. Barner (Doc. 338 p. 3; Doc. 338-1). The email was sent to Dr. Barner personally as chairman of the IDC and related to a strategy regarding monitoring blood plasma or anticoagulant activity (Doc. 338 pp. 3-12). In the email, Dr. Dugi noted that although the " 'no INR measurement' with Pradaxa is one of the most frequently stated advantages, prescribers continue to express a need for additional tools or clinical markers to identify patients at a high risk of bleed" (Doc. 338 p. 5; Doc. 338-1). Dr. Dugi went on to propose a strategy for monitoring blood plasma or anticoagulant activity that he hypothesized could "preserve the effect on ischemic stroke prevention but with a reduction of major bleeding events compared to well controlled warfarin of perhaps up to 30-40%" (Doc. 338 pp. 5-6; Doc. 338-1).

### 3. The Court's Conclusions

In the context of senior executives, in the majority of cases, the discovery sought can be obtained through some less intrusive means, such as taking the depositions of other employees. In the instant case, with regard to some of the critical issues relevant to this litigation, the testimony cited simply indicates that

7

relevant decisions were made by the IDC, BMD, and/or the Pradaxa steering committee. Thus, to some extent, there are other less prominent employees (those who were members of these groups) who could provide testimony on these matters. Some of these employees have already been deposed and some will be providing testimony in the near future. That, however, is not the end of the issue.

As noted above, BII has held Dr. Barner out as a unique executive. An executive who, unlike most corporate executives, is "hands-on." BII touts the primary role Dr. Barner plays in drug development as the head of Research and Development. Thus, BII's own representations regarding Dr. Barner tend to support the conclusion that Dr. Barner possesses unique, first-hand, non-repetitive knowledge of facts at issue in this case.

The testimony provided by Dr. Dugi further supports this conclusion. Dr. Dugi wrote an email to Dr. Barner regarding his proposal for a monitoring protocol – an issue critical to the current litigation. Dr. Dugi did not simply direct his proposal to the IDC in general or place his proposal on the agenda for the IDC and leave it at that. Rather, he specifically sought out Dr. Barner. He appealed to Dr. Barner personally, seeking his approval and support.

Unlike the cases cited by BII, this is not a situation where the plaintiffs seek to depose a high-level executive who is remote from the subjects at issue in the litigation. Rather, the plaintiffs have presented evidence indicating that Dr. Barner was highly involved in matters relevant to this litigation. The plaintiffs are

8

certainly entitled, considering the exchange between Dr. Dugi and Dr. Barner as well as the manner in which BII has held Dr. Barner out to the world, to learn more about Dr. Barner's unique position in the research and development of Pradaxa, his role as chief executive relative to decisions relevant to this litigation, the reasons behind decisions relevant to this litigation, and his personal influence, if any, with the IDC, the BMD, the Pradaxa Steering Committee, and the ownership group to whom he personally reported.

Considering the above, the balancing of circumstances militates in favor of allowing the deposition of Dr. Barner to proceed. **Accordingly, BII's motion for a protective order relative to Dr. Barner is DENIED.**

**B. Allen Hillgrove**

Mr. Hillgrove is a member of the BMD. According to BII, Mr. Hillgrove and other members of the BMD are the second highest ranking officers in the organization (Doc. 293 p. 2). Prior to assuming his BMD position at the beginning of this year, Mr. Hillgrove was the Head of Established Markets (Doc. 293 p. 3). Although BII acknowledges Mr. Hillgrove's role in Pradaxa-related issues, it contends that his involvement has not been as extensive as that of the BI executives and employees whose sole primary responsibilities are Pradaxa-related (Doc. 293 p. 3).

The PSC contends Mr. Hillgrove possesses unique knowledge relevant to this litigation that cannot be obtained through less intrusive means. Specifically,

9

the PSC contends Mr. Hillgrove's testimony is essential in four topic areas in which he has gained specialized knowledge throughout his tenure at BII. These topic areas include: (1) the launch of Pradaxa in the United States; (2) the sales and marketing of Pradaxa; (3) involvement with the cross-sectional relationship between sales and marketing and regulatory affairs; and (4) international sales and regulatory issues related to Pradaxa (Doc. 307 p. 15).

The Court has thoroughly reviewed the parties' submissions regarding Mr. Hillgrove. Based on the information presently available, the Court finds the plaintiffs have not yet made a showing that Mr. Hillgrove is uniquely positioned to provide the evidence the plaintiffs seek. Accordingly, the Court finds it appropriate to exercise its discretion and prohibit Mr. Hillgrove's deposition at this time. There appear to be a number of persons the plaintiffs are due to depose that are quite close to Mr. Hillgrove's position. The plaintiffs should inquire of these witnesses regarding the issues they would inquire of Mr. Hillgrove.

Considering the above, the balancing of circumstances militates against allowing the deposition of Mr. Hillgrove to proceed. However, should the plaintiffs develop evidence that Mr. Hillgrove has unique, first-hand, non-repetitive knowledge of facts at issue in the case and depositions of other employees have proven unsuccessful, the Court will reconsider the issue. **Accordingly, BII's motion for a protective order as to Mr. Hillgrove is GRANTED without prejudice to the plaintiffs seeking leave to re-notice his deposition if and when they can demonstrate a need for his deposition.**

## IV.  CONCLUSION

BII's motion for a protective order relative to Dr. Barner is DENIED. BII's motion for a protective order as to Mr. Hillgrove is GRANTED without prejudice to the plaintiffs seeking leave to re-notice his deposition if and when they can demonstrate a need for his deposition.

SO ORDERED:

Digitally signed by David R. Herndon
Date: 2014.01.23 16:33:28 -06'00'

**Chief Judge**  
**United States District Court**

Date:  January 23, 2014