UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

_____

| | | |
|---|---|---|
| IN RE PRADAXA | ) | MDL No. 2385 |
| (DABIGATRAN ETEXILATE) | ) | 3:12-md-02385-DRH-SCW |
| PRODUCTS LIABILITY | ) | Judge David R. Herndon |
| LITIGATION | ) | |

_____

**This Document Relates to:**

*All Cases*

## CASE MANAGEMENT ORDER NUMBER 88
### Phase One Payment Allocations

This litigation was transferred to this Court by the JPML in August of 2012, and the initial MDL status conference was held by this Court on October 3, 2012. Just a year and a half later, on May 28, 2014, after an extensive mediation process supervised by the Court and the Special Master, the defendants and the Pradaxa Claimants' Negotiating Counsel executed the Pradaxa Product Liability Litigation Master Settlement Agreement ("MSA"). The negotiations that led to the MSA were vigorous, at arm's length, and were conducted in good faith with each party zealously representing their clients. During the 18-month period leading to settlement negotiations, the parties worked tirelessly in the production and review of approximately 80 million pages of documents and the deposition of 48 defense corporate witnesses (many taken abroad), not to mention the numerous case-specific bellwether depositions and an appeal to the Seventh Circuit. The speed with which the parties worked was especially important and commendable here given the elderly, aging plaintiff population.

The MSA provides for the claims and allocation process, which has been followed by the Court, parties, Claims Administrator, and Special Master. The adjudications of Phase One Claim Package Submissions are now final and the allocation for each claimant has been determined. The MSA required that certain percentages of eligible enrolled-claimants participate in the settlement in order for the settlement to become binding, ranging from 92% to 95% based on injury category. The participation rate was higher than 98%, demonstrating the value that the settlement is providing to the claimants. Due to the number of claimants qualifying to participate in the settlement, including the number of death cases, the allocations based upon projected "intent to pay" amounts identified in ¶8.2(b) of the MSA exceeded the total settlement amount, triggering operation of ¶6.3 of the MSA.[1]

Based on the foresight of the parties, the MSA establishes a procedure for what will occur in the event that the amounts described in ¶¶ 8.1 and 8.2 are not able to be paid because the total amount of claims based on those "intended" awards exceeds the amount deposited into the Phase One Payments Account. It is this foresight of the parties that has resulted in the settlement still being able to proceed and provide fair compensation to all of the Participating Claimants. According to Paragraph 6.3 of the MSA:

---

[1] Because the Claims Administrator and the Special Master were tasked with swift review based upon streamlined criteria and thresholds, claimants benefitted by inclusion into the settlement program. Of course, this benefit of inclusion has also resulted in a modest reduction in award amount as described herein.

> If the Phase One Payments described in Paragraphs 8.1 and 8.2 collectively exceed the amount deposited into the Phase One Payments Account as described in Paragraph 6.2 (a) above,
>
> (a) the overage shall first be drawn from the Phase Two Supplemental Payment Account described in Paragraph 6.2 (b) above; and
>
> (b) if the entirety of the Phase Two Supplemental Payment Account described in Paragraph 6.2 (b) above is still insufficient to meet the obligations required herein for the Phase One Payments described in Paragraphs 8.1 and 8.2 collectively, then such obligations shall be paid pro rata by virtue of the individual obligations described in Paragraphs 8.1 and 8.2 collectively, divided by the total funds available after the distributions made from the Phase One Payments Accounts and the overage drawn from the Phase Two Supplemental Payment Account described in Paragraph 6.2 (b) above.

Due to the total amount of Phase One Payments, the Phase Two Supplemental Payment Account was applied to Phase One Payments (pursuant to ¶6.3(a) of the MSA), which consumed the entirety of the Phase Two Supplemental Payment Account. Therefore, based on operation of the MSA, there will be no Phase Two Supplemental Payments. Additionally, the claimant's Phase One Payment will be reduced pro rata as provided for in ¶6.3(b) of the MSA. Naturally, claimants and their counsel want maximum compensation to be awarded to each claimant. However, the foresight to allow for the reduction in award due to increased participation should not be considered a detriment, rather this provision is the very language allowing all qualifying claimants to achieve a recovery (had the MSA been silent on this issue, the result would have likely been destruction of the entire settlement).

To further expand on its findings regarding the negotiations, the Court would point out that, based on its own participation, it is quite clear that the defendant was simply at the point where it would pay no additional money to settle the cases globally and it was equally clear that based on what was known of the inventory and what could be reasonably anticipated of the unknown cases, based on counsel's inventories of unfiled cases and rates of average case filings, that the tendered offer represented an excellent compensation package for the global inventory given the characteristics of the cases known. As noted above, the settlement contemplated a second phase award for the more serious cases. However, because provisions were made within the agreement for the eventuality of running out of money in the first phase, no one can contend that such an occurrence was beyond question. All those who opted in, which was nearly a unanimous choice, are presumed by this Court to have understood the contract language to which they were agreeing. Even though the contract contemplated the possibility and all negotiating members agreed on the concept by including the elimination of Phase Two if the money ran out, rather than a "backstop provision" or a provision requiring the defendant to "pony up" more cash, no lawyer on the plaintiff's side really thought there would be so many claims nor so many death claims. These are not facts that the negotiating team could have known when in mediation, nor could the lawyers in the field have known when discussing the Phase One-Phase Two provisions with their clients. The fact of the matter is the end result doesn't make this settlement something of lesser value even if some

plaintiffs are disenchanted with the proportional reduction, given the characteristics of the litigation and the cases which populate it. The plaintiffs approved this settlement, nearly unanimously, and there is a contract to settle in each individual case unless each individual plaintiff or the group as a whole can demonstrate a defense to the foundation of that contract. This is not a class action and the Court is not charged with approving the settlement, though it is one that would certainly seem to garner such approval.

The Special Master and the Claims Administrator have worked together with the parties to determine the final Phase One Payments after applying the pro rata reduction required by ¶6.3(b) of the MSA. In accordance with the MSA, the Special Master has presented to the Court a spreadsheet concerning the final Phase One Payments for this matter demonstrating the final awards for each category after operation of the pro rata reduction required by MSA ¶6.3. The spreadsheet was generated by the Claims Administrator and is attached as Exhibit A hereto.

In addition, the Phase One Payments account for a reserve of certain funds as indicated on Exhibit A. If the reserve funds are not expended to potential claimants, then the funds shall be distributed pro rata based upon the previous Phase One Payments at the same time as any excess Common Benefit Expense is distributed to Phase One Participating Claimants.

The parties continue to work with the Court, Special Master, and Claims Administrator to resolve all remaining issues, including disbursement and lien resolution procedures.  This process will continue and the parties have agreed to the distribution of funds in accordance with the MSA.  For the first distribution, the Lien Administrator has compiled a list of over 1500 Participating Claimants whose funds are eligible for disbursement upon entry of this Order on this date.[2] The remaining Participating Claimants will receive distributions as the parties agree to their eligibility.

**IT IS SO ORDERED**.

Signed this 29th day of December, 2014.

Digitally signed by David R. Herndon
Date: 2014.12.29 14:44:58 -06'00'

**United States District Judge**

---

[2] The Court understands that he QSF Administrator will require up to a week to process payment information translating into distributions during the first part of January 2015.